**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Alfred CARPENTIER,**
**Defendant-Appellant.**

**No. 1266, Docket 81–1487.**

United States Court of Appeals,
Second Circuit.

Argued June 15, 1982.
Decided Sept. 20, 1982.

James A. Pascarella, Garden City, N.Y., for defendant-appellant.

Laura A. Brevetti, Sp. Atty., E.D. New York, Brooklyn, N.Y. (Edward R. Korman, U.S. Atty. for the E.D. New York, Edward A. McDonald, Atty.-in-Charge, Dept. of Justice, Organized Crime Strike Force, E.D. New York, Lawrence H. Sharf, Sp. Atty., E.D. New York, Brooklyn, N.Y., of counsel), for plaintiff-appellee.

Before NEWMAN and PIERCE, Circuit Judges, and KNAPP,* District Judge.

PIERCE, Circuit Judge:

Among those caught in the sweep of the ABSCAM net was appellant Alfred Carpentier.[1] ABSCAM was a Federal Bureau of Investigation ("FBI") undercover operation which came into existence during the summer of 1978. The initial goal of ABSCAM was the recovery of stolen property, partic-

---

* The Honorable Whitman Knapp of the United States District Court for the Southern District of New York, sitting by designation.

1. ABSCAM is an acronym taken from the "first two letters of 'Abdul Enterprises Ltd.,' the name given to the fictitious Middle Eastern business that the undercover agents invented for the purposes of the investigation that led to [this indictment] and the word 'scam,' a slang expression, perhaps derived from 'scheme' meaning a confidence game or swindle. Webster's New World Dictionary 1270 (2d college ed. 1978)." *United States v. Myers,* 635 F.2d 932, 934 n. 1 (2d Cir.) *cert. denied,* 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980).

ularly securities and certificates of deposit. By the end of 1978, however, the focus of the operation had been turned towards the growing presence of organized crime in Atlantic City. This aspect of the operation led in turn to the investigations into political and public corruption which thrust ABSCAM into national prominence.

ABSCAM operated behind a cover organization, Abdul Enterprises, which purportedly represented the investment interests in the United States of two Arab sheiks, Kamad Abdul Rahman and Yassir Habib. These sheiks were fictitious characters. In fact, at no time were any Arabs connected with Abdul Enterprises.[2] The undercover agents who were involved with ABSCAM told various individuals that the sheiks had supplied Abdul Enterprises with $400 million for the purpose of investment into various ventures. This money was supposedly on deposit at the Chase Manhattan Bank.[3]

In 1978 Carpentier was apparently the owner of the Beefalo Cattle and Land Company ("Beefalo"), a farm in upstate New York. Sometime during the latter part of 1978, a banker friend of Carpentier introduced him to Melvin Weinberg, a self-confessed confidence man who worked as a paid consultant in the ABSCAM operation. According to the testimony of both Weinberg and FBI Agent Anthony Amoroso, it seems apparent that Carpentier's initial aim with regard to Abdul Enterprises, at least in part, was to persuade the "officers" of the organization to invest in Beefalo.

On March 23, 1979, at Weinberg's invitation, Carpentier attended a party in Florida on the yacht "Left Hand," which was employed by the FBI in connection with its ABSCAM activities. At that party, Carpentier told Weinberg and FBI Agent Anthony Amoroso[4] that he was able to obtain passports and green cards[5] through two employees of the United States Immigration and Naturalization Service ("INS"), Alexander A. Alexandro, Sr. and his son Alexander, Jr.[6]

This information was conveyed to John Good, Amoroso's superior, and the FBI decided to attempt to arrange a meeting, via Carpentier, between the agents and Alexandro, Jr. (hereinafter "Alexandro"). Weinberg telephoned Carpentier and asked him to meet with himself and Amoroso at the Abdul Enterprises offices in Holbrook, Long Island.[7] This meeting, at which Carpentier, Weinberg, Amoroso and Agent Carol DeRosa were present, was taped. During the meeting, Weinberg and Amoroso explained to Carpentier that they wished to avail themselves of Alexandro's aid in facilitating the illegal entry into the United States of Thomas Foley, an "Irish kid" who was the son of a friend of one of the "Arabs."[8]

---

**2.** Weinberg testified that Kamad Abdul Rahman was actually the name of a Lebanese businessman and friend. Weinberg suggested the use of the name in conjunction with ABSCAM.

**3.** FBI Agent Anthony Amoroso testified that Abdul Enterprises had an arrangement with the bank with respect to verification of this representation.

**4.** For the purposes of his role as president of Abdul Enterprises, Amoroso used the cover name Tony DeVito.

**5.** A "green card" is a document which evidences an alien's permanent residence status in the United States.

**6.** Alexandro, Sr., was apparently working at the INS's Honolulu, Hawaii, office when the events relevant to the present case occurred. The record does not indicate that Alexandro, Sr., was a target of the ABSCAM investigation or that he was in any way involved with the present matter.

**7.** It is not entirely clear from the record whether the office was in Holbrook or in Hauppauge, Long Island. However, Amoroso stated that the office was located in Holbrook.

**8.** During the May 30th meeting, Carpentier asked if Foley was a citizen of Northern Ireland or the Irish Free State. Amoroso purported not to know. At a later time, Amoroso told Alexandro that Foley was an Irish citizen living in Dublin. At trial, Amoroso testified that Foley was a real person related in some fashion to Agent Good. However, it is not clear whether Foley was actually a citizen or resident of Ireland.

The transcript of the tape of the May 30th meeting shows that Carpentier was aware that Alexandro was to be paid for obtaining a green card for Foley: at one point Carpentier stated, "[c]an you get ten grand from [Foley]? By the way, some people pay 50 to 100 grand for this green card, ya know." He assured Amoroso that Alexandro was a "nice guy" who would not "rob" Amoroso in the transaction. Amoroso gave Carpentier $500 for "expenses," and Carpentier stated that Amoroso was to give him his "usual ten percent."

Carpentier contacted Alexandro and on the following day, May 31, 1979, Alexandro met with Carpentier, Amoroso and Weinberg at the Colon[ie] Hill Hotel on Long Island. During this meeting, which was taped, various ways and means of providing Foley with a green card were discussed. Carpentier participated actively in the discussion: at one point, when they were considering the possibility of providing Foley with a corporate sponsor, Carpentier stated that "Beefalo Cattle and Land will hire him." By the end of the meeting, Alexandro had indicated his willingness to use his position to provide Foley with a green card.

During the subsequent three months, an elaborate scheme was concocted for the purpose of bringing Foley illegally into the United States. It was ultimately decided that the best plan would be to arrange a sham marriage between Foley and an American woman. The two would divorce once Foley was safely established as a resident of the United States. Alexandro arranged for all necessary papers and went so far as to find a young woman who was willing to become Foley's wife. Alexandro was to personally conduct Foley through customs and immigration. The final price for the entire package was $15,000. Amoroso gave Alexandro a $2000 downpayment on this sum.

During the course of planning the scheme, at least two telephone calls, on June 19th and on June 29th, were made by Carpentier to Weinberg. These calls, which Weinberg taped, were for the purpose of coordinating arrangements between Amoroso and Alexandro. In addition, several telephone calls between Alexandro and Amoroso were taped, and, ultimately, a meeting at the International Hotel at New York's Kennedy Airport was videotaped. Only Alexandro, Amoroso and Weinberg were present at this meeting. The videotape and the audio tapes of the various meetings and telephone calls discussed herein were admitted into evidence against each defendant at the subsequent trial of Alexandro and Carpentier.

On March 3, 1980, an Eastern District of New York grand jury indicted both Carpentier and Alexandro on each of three counts: (1) conspiracy to receive bribes in violation of 18 U.S.C. § 371; [9] (2) receiving bribes in violation of 18 U.S.C. § 201(c); [10] and (3) conflict of interest in violation of 18 U.S.C. § 203(a).[11] They were tried jointly by a jury before Federal District Judge Mark A.

9. 18 U.S.C. § 371 provides in pertinent part that:

[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of such conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

10. 18 U.S.C. § 201(c) provides that:

[w]hoever, being a public official ... directly or indirectly, corruptly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself or for any other person or entity, in return for: (1) being influenced in his performance of any official act; or (2) being influenced to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or (3) being induced to do or omit to do any act in violation of his official duty ... (e) [s]hall be fined not more than $20,000 or three times the monetary equivalent of the thing of value, whichever is greater, or imprisoned for not more than fifteen years, or both, and may be disqualified from holding any office of honor, trust, or profit under the United States.

11. 18 U.S.C. § 203 provides in pertinent part that:

(a) [w]hoever, otherwise than as provided by law for the proper discharge of official duties, directly or indirectly receives or agrees to receive, or asks, demands, solicits,

Costantino. Carpentier was convicted on the charges in counts one and three and acquitted of bribery as charged in count two. Alexandro was convicted on all three counts.[12] Carpentier was sentenced to four years imprisonment and fined $5000 on the first count and to two years imprisonment and an additional $5000 fine on the third count. Execution of the judgment of imprisonment imposed on count three was suspended. Carpentier timely appealed the judgment of conviction against him to this Court.

For the reasons set forth hereinbelow, we affirm.

*DISCUSSION*

Carpentier presents four arguments on appeal: (1) the government's conduct in the ABSCAM investigation as it related to this case was so intrusive that it violated appellant's due process rights under the fifth amendment; (2) appellant was entrapped "as a matter of law"; (3) the trial judge abused his discretion by refusing to sever the trial of appellant from that of Alexandro; and (4) the trial judge committed reversible error when he refused to permit an individualized *in camera voir dire* of prospective jurors. These points shall be considered *seriatim*.

I

Carpentier's main argument on appeal is that the government's conduct in this case was "so outrageous that due process principles ... absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973). In his brief on appeal, Carpentier points to what he describes as the "uncontrolled" use of the "archetypical, amoral, fast-buck artist" Melvin Weinberg, quoting *United States v. Jannotti,* 501 F.Supp. 1182, 1193 (E.D. Pa. 1980), *rev'd,* 673 F.2d 578 (3d Cir. 1981) (*en banc*), *cert. denied,* —— U.S. ——, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982),[13] as an offense against the principles of due process. He also maintains that a government investigation becomes "outrageous" when, as he sees it, it manufactures crime rather than attempts to prevent or arrest criminal behavior.

We note at the outset that, as Justice Powell stated in his concurrence in *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), "the cases, if any, in which proof of predisposition is not dispositive will be rare. Police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction." *Id.* at 495 n. 7, 96 S.Ct. at 1653 n. 7 (Powell, J., concurring). This is not such a case.

This Court has consistently rejected the defense urged here in a variety of contexts.

---

or seeks, any compensation for any services rendered or to be rendered either by himself or another—... (2) at a time when he is an officer or employee of the United States in the executive, legislative, or judicial branch of the Government, or in any agency of the United States, ... Shall be fined not more than $10,000 or imprisoned for not more than two years, or both; and shall be incapable of holding any office of honor, trust or profit under the United States.

**12.** Alexandro appealed to this Court and an opinion affirming his conviction was filed on March 18, 1982. This opinion is reported at 675 F.2d 34 (2d Cir. 1982).

**13.** The entire thrust of defense counsels' cross-examination of Weinberg at trial was to discredit him and to show that he operated within ABSCAM without substantial supervision from the FBI. During cross-examination, Weinberg testified that he had been a confidence man for 20–25 years. He admitted to committing "swindles" in Europe and South America as well as in the United States. Weinberg also testified that he had done informant work for the FBI since the mid-1960s, and that he had continued to swindle people while so employed. In response to defense counsel's questions, he also indicated that he had a good deal of discretion regarding when he would tape conversations with potential targets of the investigation. Additionally, he apparently had some discretion in selecting those targets.

On direct examination, the government's attorney elicited from Weinberg that in 1977 he had pleaded guilty to an indictment for mail fraud and wire fraud in the Federal District Court for the Western District of Pennsylvania. He received probation for the offense. Weinberg testified that at no other time in his career had he been convicted of a crime.

In *United States v. Nunez-Rios,* 622 F.2d 1093 (2d Cir. 1980), a Drug Enforcement Administration ("DEA") informant had supplied defendants with a quantity of cocaine which they in turn sold to a DEA agent. There was little question of defendants' predisposition to commit the crime; the government's involvement was limited to supplying them with the means. The Court stated that these "facts fall far short of the kind of outrageous conduct which would violate defendant's due process rights." *Id.* at 1097.

In *United States v. Corcione,* 592 F.2d 111 (2d Cir.), *cert. denied,* 440 U.S. 975, 99 S.Ct. 1545, 59 L.Ed.2d 794, 985, 99 S.Ct. 1801, 60 L.Ed.2d 248 (1979), government agents supplied heroin to the defendants while they were in Thailand, and the government assisted in the plans for its transportation to and sale in the United States. This Court again held that this did not rise to the level of outrageousness contemplated in *Russell.*

Appellant relies on *United States v. Archer,* 486 F.2d 670 (2d Cir. 1973), as support for his due process claim. In *Archer,* undercover officers told lies to police officials, grand jurors and judges during the course of their investigation into official corruption. Judge Friendly indicated strong disapproval of the agents' behavior in his opinion reversing defendants' convictions, and he further indicated that the case might be one in which due process grounds would alone require reversal. However, since the Court had determined that the convictions should be reversed for lack of evidence of actionable interstate telephone calls, the due process question was left for resolution at another time. *Id.* at 677.

After Archer's federal indictment was dismissed, he was indicted by the State of New York for state crimes similar to those in the federal indictment. After conviction and unsuccessful appeals through the New York courts, Archer returned to this Court via the federal habeas corpus route. Judge Friendly again wrote for the Court in *Archer v. Commissioner of Correction,* 646 F.2d 44 (2d Cir.), *cert. denied,* 454 U.S. 851, 102 S.Ct. 291, 70 L.Ed.2d 141 (1981). There, the Court held that with respect to "due process applicable to the states," the governmental

conduct at issue was not "so outrageous as to constitute a denial of due process." *Id.* at 46–47.

Carpentier also relies on the district court opinion in *United States v. Jannotti, supra.* At issue therein was the ABSCAM investigation, and the conduct of Melvin Weinberg was closely scrutinized by the district court in dismissing the indictment. However, in a thorough opinion carefully analyzing claims quite similar to those made here, the Third Circuit, *en banc,* reinstated the convictions. Cautioning that "[w]e must necessarily exercise scrupulous restraint before we denounce law enforcement conduct as constitutionally unacceptable," *Id.* 673 F.2d at 607, the court noted that " '[t]he limitations of the Due Process Clause of the Fifth Amendment come into play only when the Government activity violates some protected right of the *defendant.*' " *Id.* at 610 (quoting *United States v. Hampton, supra,* 425 U.S. at 490, 96 S.Ct. at 1650 (emphasis in original)).

■ Undercover operations for the purpose of exposing bribery among public officials certainly are not *per se* unconstitutional. *United States v. Myers,* 635 F.2d 932, 939 (2d Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980) ("Myers I"). (*Myers I* also arose from the ABSCAM investigation. However, the due process issue presented here was not directly before the Court in that case.) In any event, Carpentier's appeal in the due process issue must be assessed in terms of this Court's decision in *United States v. Alexandro,* 675 F.2d 34 (2d Cir. 1982). There, reviewing the same record on appeal as is before us in this case, we considered facts substantially similar to those which underlie the due process claim made on the present appeal. We find here, as we noted therein, that Carpentier "initiated the fraudulent scheme to obtain the green card for Foley." *Id.* at 41. We also find here, as we found in Alexandro's case, that the facts presented on this appeal fall "far short of indicating conduct that would violate [appellant's] rights pursuant to the due process clause." *Id.* at 40.

It is clear that Alexandro's claim of due process violation, while ultimately found to

be lacking, was if anything stronger than is Carpentier's: Alexandro could at least claim that the contact with him regarding the scheme was initiated at the behest of the government; Carpentier, on the other hand, initiated the suggestion that he could obtain false green cards.

To recapitulate, the government's behavior with respect to Carpentier was as follows: he was invited to a party on a yacht in Florida; while there, he volunteered, apparently without solicitation, that he could put interested persons in contact with a source of illegal green cards and passports; when asked, he did in fact act as a go-between in a scheme to obtain an illegal green card. The government merely followed up on his own proposal of criminal activity.

As to whether other aspects of the AB-SCAM operation rose to the level of outrageous overinvolvement that could bar a criminal conviction is not a question that need be answered by the Court in this case. *See United States v. Hampton, supra,* 425 U.S. at 490, 96 S.Ct. at 1650; *United States v. Myers,* 692 F.2d 823 (2d Cir. 1982) ("Myers II"); *United States v. Jannotti, supra,* 673 F.2d at 610. It simply did not rise to that level here.

## II

■ Appellant claims that he is entitled to have the judgment of conviction against him reversed "as a matter of law" because the government entrapped him. This claim is made despite an acknowledgement by appellant that he did not raise the defense of entrapment at the trial level.

Having failed to raise the defense of entrapment below, appellant is precluded from raising it here. *United States v. Myers,* 692 F.2d 823 (2d Cir. 1982) ("Myers II"); *United States v. Valencia,* 645 F.2d 1158, 1172 (2d Cir. 1980); *United States v. Bishop,* 367 F.2d 806, 809 (2d Cir. 1966). When entrapment is asserted as a defense, the government is entitled to notice of the proposed defense so that it may offer evidence of predisposition in rebuttal. *United States v. Bishop, supra,* 367 F.2d at 809.

Furthermore, even if we were to reach the substantive question, the record demonstrates that appellant was predisposed to commit the crimes for which he was indicted and convicted, thereby rendering any entrapment claim unmeritorious, since "[i]t is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play." *United States v. Russell, supra,* 411 U.S. at 436, 93 S.Ct. at 1645.

## III

Carpentier moved for a severance of his trial from that of Alexandro's on one occasion before trial and on three separate occasions thereafter. These motions were denied. Carpentier now claims that because of Alexandro's defense strategy, this failure to grant him a severance denied him a fair trial.

Co-defendant Alexandro's defense at trial was that he pretended to go along with the illegal green card scheme in order to carry out his own investigation into corruption. Carpentier asserts that this defense was directly in conflict with his own because, for reasons not fully made clear, "[i]f the jury were to acquit appellant Carpentier, they had to disregard Alexandro's defense and find [Alexandro] guilty," (In fact, the jury did convict Alexandro as charged on all three counts. See footnote 12, *supra*).

■ Appellant concedes that the standard for appellate review of a denial of a motion to sever made pursuant to Rule 14 of the Fed. R. Crim. P. is "an abuse of discretion" on the part of the trial judge. In order to meet his "extremely difficult burden of showing on appeal that the lower court's action [of refusing to grant a motion to sever] was an abuse of discretion," defendant must demonstrate that there was "substantial prejudice" resulting from the denial of the motion. *United States v. Werner,* 620 F.2d 922, 928 (2d Cir. 1980). A certain amount of prejudice to a defendant is regarded as acceptable given the judicial economies that result from joinder. *Id.* at 929.

■ A simple showing of some antagonism between defendants' theories of de-

fense does not require severance. "[T]he defense of a defendant reaches a level of antagonism [with respect to the defense of a co-defendant] that compels severance of that defendant, if the jury, in order to believe the core of testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant." *United States v. Berkowitz,* 662 F.2d 1127, 1134 (5th Cir. 1981).

■ It is difficult to see how Alexandro's defense that he was himself ferreting out corruption prejudiced Carpentier in the least; it certainly failed to rise to the standard enunciated by the *Berkowitz* court. Further, there is no necessary incompatibility between Alexandro's defense and that offered by Carpentier, namely that the latter was simply spending time with Weinberg and Amoroso in hopes of interesting the "sheik" in purchasing or investing in his Beefalo Cattle and Land Company.

The most damaging evidence against both Carpentier and Alexandro consisted of the taped conversations and the testimony of Weinberg and Amoroso. With regard to Carpentier, this evidence, as noted, showed Carpentier to have first suggested the possibility of obtaining illegal green cards to the undercover agents. The tapes demonstrated that he was a willing participant in arranging a meeting between Alexandro and the agents, and in helping to formulate the illegal green card scheme thereafter. Alexandro's defense did not exacerbate the impact of that evidence. There appears to be no reason why the jury could not have believed Alexandro's story and yet still have found that Carpentier lacked the requisite intent to commit the crimes with which he was charged. The simple fact is that both Carpentier and Alexandro were convicted on the basis of an abundance of evidence presented as to each defendant. We conclude that the district judge did not abuse his discretion in denying appellant's motions to sever.

## CONCLUSION

Appellant Carpentier's attack on the investigative procedures employed in AB-SCAM raises substantial questions about the proper role of law enforcement in our society. As discussed herein, the Supreme Court has on more than one occasion indicated that those procedures may at times become so intrusive as to violate an individual's due process rights, irrespective of the person's guilt or innocence, and without regard to his predisposition to commit the offense with which he is charged.

ABSCAM has received intense publicity since the investigation first reached the public eye. We must be careful not to lose sight of the specific facts of this case when viewing them in the broader context of ABSCAM. As the Supreme Court has stated, the courts may not employ the principles of due process or entrapment as a "veto over law enforcement practices" of which they may or may not approve. *United States v. Russell, supra,* 411 U.S. at 435, 93 S.Ct. at 1644.

We find that the government's actions with reference to appellant were not so outrageously intrusive as to violate his rights to due process. In addition, appellant's entrapment claim is without merit, and the trial judge did not abuse his discretion by denying the motions to sever, or by the manner in which he conducted the jury selection process.

*Affirmed.*