UNITED STATES of America,

v.

Adham Ahmed K. BADR, Anthony Owens, Sergio Boris Acosta-Rojas, James Edward O'Connell, Nelson DeJesus Rueda, Defendants.

No. 84 Crim 00672.

United States District Court,
E.D. New York.

March 8, 1985.

Asst. U.S. Atty., Thomas Milton, Eastern Dist. of N.Y., for plaintiff.

Francis Murray, Murray & Skoff, New York City, for Badr.

Richard Finkelstein, Legal Aid Services, Brooklyn, N.Y., for O'Connell.

Michael A. Laurano, Boston, Mass., for Acosta-Rojas.

William Brodsky, Baden, Kramer, Huffman & Brodsky, New York City, for Rueda.

Howard Jacobs, New York City, for Owens.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GLASSER, District Judge:

In a one count indictment filed on December 14, 1984, the defendants were charged with conspiracy to knowingly and intentionally distribute and possess with intent to distribute a substantial quantity of cocaine hydrochloride in violation of 21 U.S.C. §§ 841(a), 846. Thereafter, on February 1, 1985, a superseding indictment was filed which contained a second count charging the defendants with possession with intent to distribute a substantial quantity of cocaine hydrochloride in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

A motion to suppress statements made and physical evidence seized was made by the defendants Acosta-Rojas, O'Connell and Rueda. A motion was made by each of the defendants to dismiss the superseding indictment pursuant to 18 U.S.C. § 3161(b) or, in the alternative, to postpone the commencement of the trial pursuant to 18 U.S.C. § 3161(c)(2). In addition, the defendants O'Connell, Acosta-Rojas and Rueda have moved for a severance pursuant to Rule 14 of the Fed.R.Crim.P.

Hearings were held on each of the motions and the Court makes the following findings of fact and reaches the following conclusions of law.

## I.

### Events Leading to Arrests

On November 30, 1984, Kathleen Bennett, an agent of the Drug Enforcement Administration (DEA), was acting in an undercover capacity and together with an informant was to arrange for the purchase of a quantity of heroin or cocaine or both. Arrangements were made on that day for a meeting between them and the defendant Badr at the Hilton Inn at Logan Airport in Boston, Massachusetts. The meeting took place that afternoon. Accompanying Badr was the defendant Owens (also known as Tony Massai) who was introduced by Badr as the man who could provide the drugs.

Owens stated that he had people who were then at the Holiday Inn at LaGuardia Airport ready to do business in cocaine and eventually plans were made to consummate the transaction in New York on December 5, 1984. Bennett and the informant were in New York on that day and met Badr at LaGuardia Airport as he arrived on the Eastern Airlines shuttle from Boston. The three went to the Sheraton Inn where, after some discussion, Badr announced that he was required to take the informant to Flanagan's Bar at 65th Street and First Avenue in Manhattan so that someone there could view the informant and approve him as someone who could be dealt with safely. If approval was given, Badr would contact Owens, who would come to New York and conclude the transaction.

When Badr and the informant returned to the Sheraton, Agent Bennett was told by Badr that Owens was contacted and that he would arrive on the 5:00 o'clock shuttle from Boston to New York. In Boston, DEA agents were stationed at Logan Airport and Bennett was advised by them shortly before 6:00 P.M. that Owens and two others who were later identified as defendants Acosta-Rojas and O'Connell, arrived in a white Lincoln automobile and were observed proceeding down the ramp towards the Eastern shuttle to New York.

The informant was awaiting the arrival of Owens at LaGuardia Airport; so were many agents of the DEA who observed Owens, Acosta-Rojas and O'Connell on the Eastern shuttle ramp leading from the Boston plane. Owens departed with the informant. Acosta-Rojas made a telephone call, after which he and O'Connell waited outside the terminal until a blue Toyota Corolla, driven by a person wearing a ski jacket and later identified as the defendant Rueda, arrived. Acosta-Rojas and O'Connell entered that vehicle and drove off.

DEA agents followed that Toyota until it parked on a street in Queens and the three occupants were seen entering an apartment house.

In the interim, back at the Sheraton, the informant arrived with Owens and they met with Badr and agent Bennett. Owens informed the others that his people had gone to pick up the cocaine and would bring about four kilos of it to the Sheraton before long. He also told them that he expected to receive $40,000 per kilo or a total of $160,000.

While Bennett, Badr, Owens and the informant were working out the details for completing the transaction, DEA agents were in virtually every strategic area of the Sheraton and were in continuous communication with each other by radio, sign or word of mouth. The blue Toyota was observed to arrive in the Sheraton parking lot. DEA agents observed conversations between Acosta-Rojas and Owens; they observed Acosta-Rojas meet with Rueda; Acosta-Rojas meet with O'Connell; and a meeting between O'Connell and Owens.

Owens informed Bennett, Badr and the informant that the cocaine had arrived. He told them that it was in a car nearby and that he and the informant would walk to the vehicle to get the cocaine. Agent Bennett and Badr were to go to another vehicle to get the money. The four would then meet on an adjacent road and consummate the transaction. Agent Bennett repaired to the ladies room where, by prearranged plan, she notified another DEA agent, Mary Vecchi, of those arrangements. Shortly thereafter, all the defendants were arrested. A search of the blue Toyota

uncovered four kilos of cocaine in the trunk.

## II.

### The Individual Arrests

#### A. Acosta-Rojas

This defendant was arrested by DEA Agents Alfred Cavuto and John Peluso, in the lobby of the Sheraton Inn and then driven to DEA headquarters in Manhattan by Agents Cavuto and Peluso. Also in the automobile at the time was the defendant Owens. Agent Cavuto advised them of their *Miranda* rights and each stated that they understood them (Tr. 144, 156). After they arrived at the DEA office and while Agent Cavuto was obtaining pedigree information from him, Acosta-Rojas volunteered that he was approached by a man with a beard and asked if he could get cocaine. After thinking about it for a while, he thought about someone in New York and then introduced "these people" (Tr. 146).

#### B. O'Connell

The defendant was arrested by DEA Agent Courtney immediately outside the Sheraton lobby (Tr. 289). He was advised of his *Miranda* rights (Tr. 290). Approximately ten minutes later, Agent Ball, after ascertaining that O'Connell had been given his *Miranda* warnings, engaged him in conversation and asked him some questions to which O'Connell responded. Some of those questions related to the presence of cocaine in the apartment in Queens which O'Connell was observed entering.

O'Connell was then driven to the DEA headquarters in Manhattan by Agents Millar and Vecchi. Agent Millar again advised O'Connell of his *Miranda* rights and O'Connell stated, when asked, that he understood them. (Tr. 84, 85). O'Connell also stated that he did not wish to waive those rights (Tr. 89). After arriving at DEA headquarters, Agent Millar took O'Connell to an interrogation room for the purpose of obtaining pedigree information. During the course of that process, O'Con-

nell volunteered that he was receiving $500 for his role in the events which had just transpired (Tr. 90, 111, 112, 132). He also inquired of the agents whether he would receive medical attention in a federal institution to which he would be confined if convicted.

After Agent Millar completed his pedigree inquiries of O'Connell, Agent Ball came into the room, ascertained from Agent Millar whether O'Connell had received his *Miranda* warnings and after being told that he did, Ball asked O'Connell whether he understood those warnings, to which O'Connell responded affirmatively. A conversation then ensued between Ball and O'Connell during which inculpatory statements were made. The conversation continued until O'Connell requested to consult an attorney concerning Ball's suggestion that he cooperate with the DEA. At that point, the conversation ended.

Although many questions were put to DEA agents at the hearing as to whether O'Connell requested to speak to an attorney prior to making that request of Agent Ball, I find no evidence that he had prior to that time (Tr. 101, 119, 130).

#### C. Rueda

Agent Courtney observed Rueda in a game room off the lobby of the Sheraton. He was wearing a ski jacket which appeared to be the same as the one worn by the driver of the blue Toyota (Tr. 29). Agent Courtney approached Rueda, displayed his badge and announced that he was a federal narcotics officer. Rueda was asked to identify himself and responded that he didn't understand. He was asked for identification, something with his picture or name on it. He was asked whether he had an automobile, whether he drives and whether he had anything that could identify him. To all of those inquiries, Rueda replied either that he didn't understand or "no." (Tr. 291–292).

Rueda had his right hand in his pocket during the exchange. Agent Courtney placed his hand on top of Rueda's and felt keys and something else in his pocket.

Fearing for his safety, he asked Rueda to empty his pocket. Rueda complied and a key ring with a car key on it was placed on top of a video machine. At that point, Agent Courtney was joined by Agent Smith, who said that Rueda was the same person as the one seen at the airport and Rueda was then placed under arrest. The key from his pocket was the key to the blue Toyota which the agents then searched. In the trunk of that car they found four kilograms of cocaine. Also taken from Rueda was $17,000 in cash (Tr. 184).

Agent Moore advised Rueda of his *Miranda* rights and Rueda indicated he understood them (Tr. 181–184; 216–218). In response to some questions, Rueda said that the drugs came from Colombia.

### III.

### *Conclusions of Law*

A. *The Arrests*

It would be an affectation of research to multiply citations for the proposition that a warrantless arrest may be made if there is probable cause to believe that a crime is being or has been committed and the person arrested committed it.

It would similarly be an affectation of research to multiply citations for the meaning of probable cause. Perhaps two will suffice. In *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879, the court said, at pp. 175–176, 69 S.Ct. at pp. 1310–1311:

> The rule of probable cause is a practical, non-technical conception affording the best compromise that has been found for accommodating ... often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law abiding citizens at the mercy of the officer's whim and caprice.

And in *United States v. Webb,* 623 F.2d 758 (2d Cir.1980), at pp. 761–762, the court wrote:

> The essence of probable cause is a reasonable objective basis for *belief* in a

suspect's guilt, although not necessarily *proof* of guilt beyond a reasonable doubt. While the rule prohibiting law enforcement officers from making arrests without probable cause serves to protect the public from harassment or arbitrary police actions, the rule must also serve the concommitant interest of allowing the police to enforce the law without undue restraint.... As such, probable cause to arrest is not limited to those instances where the arresting officer has acquired evidence which would be sufficient to convict the suspect at trial.... Similarly, facts ostensibly sufficient to establish probable cause for an arrest are not negated simply because such facts also may be consistent with the suspect's innocence.

> In short, while the rule of probable cause does impose a requirement on police to act with more than mere suspicion of wrongdoing, the rule also gives police a permit to act with less than absolute certainty of guilt. 'In dealing with probable cause, we deal with probabilities.'

■ This standard of probable cause is more than satisfied by the facts in this case. The presence of Acosta-Rojas and O'Connell on the same plane with Owens was no coincidence. They were seen boarding the plane with Owens at Boston and that fact was communicated to agents in New York by agents in Boston, who also provided a description of the men. Owens was by then known to be a drug dealer. He had been negotiating with an undercover agent and an informant.

Acosta-Rojas and O'Connell were then seen deplaning from the aircraft with Owens. They were seen entering a blue Toyota driven by a man wearing a distinctive ski jacket. They were followed to an apartment in Queens. They were seen shortly thereafter at the Sheraton where Owens had previously arrived to consummate the drug deal and announced that the cocaine was on its way. The same blue Toyota that drove them to the airport was in the Sheraton parking lot. The agents knew from Kathleen Bennett working under cov-

er that the cocaine was about to be exchanged for cash. Surely prudent, reasonable, cautious drug enforcement agents, guided by their experience and training, (*United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975)), dealing with probabilities, could conclude that there was something more than mere coincidence guiding the movements of Acosta-Rojas, O'Connell and Rueda. In short, they had ample probable cause to believe that a crime was being committed and that those three, together with Badr and Owens, were committing it.

The defendants would make much of the fact that the knowledge of all the facts which equal probable cause was not known to each and every agent participating in and effectuating the arrest. They would contend that the collective knowledge of all the agents does not suffice. That argument need not long detain us. As has been indicated in the findings of fact, the agents employed in the investigation were in continuous communication with each other by radio, by sign and by word of mouth. *See, e.g., United States v. Ventresca*, 380 U.S. 102, 111, 85 S.Ct. 741, 747, 13 L.Ed.2d 684 (1965); *United States v. Hawkins*, 595 F.2d 751 (D.C.Cir.1978); *United States ex rel LaBelle v. LaVallee*, 517 F.2d 750 (2d Cir. 1975), *cert. denied*, 423 U.S. 1062, 96 S.Ct. 803, 46 L.Ed.2d 655 (1976); *United States v. Almonte*, 575 F.Supp. 1549 (E.D.N.Y. 1984). To require the arresting officer to have first-hand knowledge of the negotiations in Boston, of the plane trip to New York, of the simultaneous meeting at the Sheraton and the trip to the Queens apartment, to mention just some of the logistical complexities, as a precondition for probable cause would be as absurd as it would be impossible. It is also not the law. In *United States v. Hawkins*, 595 F.2d 751 (D.C.Cir.1978) at fn. 2 on pp. 752–753, the court said: "We dismiss appellant's argument that the supervisory officer, who ordered the search ..., himself lacked probable cause.... In the first place, probable cause may emanate from the collective knowledge of the police, though the officer who performs the act of arresting or searching may be far less informed (citations omitted).... The whole complex of swift modern communication in a large police department would be a futility if the authority of an individual officer was to be circumscribed by the scope of his first hand knowledge of facts concerning a crime or alleged crime." Moreover, the supervisory officer who initiated the search challenged here had been in constant radio communication with the officers on the scene, had been given details of the observations of the other officers, and thus was aware of the possible involvement in drug dealings. *See also United States v. Ayres*, 725 F.2d 806 (1st Cir.1984); *Calero v. United States*, —— U.S. ——, 105 S.Ct. 519, 83 L.Ed.2d 408 (observations of fellow officers of the Government, engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number).

## B. *The Search*

The arrests being lawful, the search of O'Connell's shoulder bag incident to his arrest was lawful, as was the search of Rueda's person which yielded $17,000 in cash.

It may be argued that the detention of Rueda immediately prior to the formal announcement that he was under arrest (Tr. 293) was unlawful. The brief encounter occurred in a public area of a busy hotel lobby. Agent Courtney wore no uniform and displayed no weapon. He did not summon Rueda to him but instead approached Rueda and identified himself as a federal agent. To this point this case is virtually identical with *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) and Agent Courtney's conduct was based on specific and articulable facts that justified at the very least a suspicion of criminal activity.

We come then to the emptying of Rueda's pocket. Agent Courtney testified that he was concerned for his safety and about the possibility that Rueda might be armed. (Tr. 292, 293). He was in the midst of the flurry of activity and arrests marking the

culmination of an investigation of a large drug transaction. His concern for his safety was not imagined. Rueda had his hand in his pocket and Agent Courtney felt some unidentifiable object in the pocket. Our courts have frequently recognized that "to substantial dealers in narcotics firearms are as much tools of the trade as are most commonly recognized articles of narcotics paraphernalia." *United States v. Wiener,* 534 F.2d 15, 18 (2d Cir.), *cert. denied,* 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976); *United States v. Martinez-Gonzalez,* 686 F.2d 93 (2d Cir.1982). The validity of Agent Courtney's request of Rueda that he remove his hand from his pocket and the contents thereof is plainly if not eloquently supported by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967). In discussing whether there was justification for the search of Terry for weapons, the Court said, at pages 23–24, 88 S.Ct. at page 1881:

> We are now concerned with more than the governmental interest in investigating crime; in addition there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed.... Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.

Continuing on page 27, 88 S.Ct. at page 1883, the court said:

> Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.

■ In determining whether a particular stop and search is valid, a court must view the surrounding circumstances "as a whole, not as discrete and separate facts" and "through the eyes of a reasonable and cautious police officer on the scene guided by his experience and training." *United States v. Barlin,* 686 F.2d 81, 86 (2d Cir. 1982).

■ If Rueda had testified at the suppression hearing that he believed he was not free to leave and if the placing of Agent Courtney's hand upon his might be deemed "some physical touching of the person of the citizen," *United States v. Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877, which might indicate an arrest, and if the emptying of the pocket were therefore deemed a search, I would nevertheless hold that both were lawful. I have already alluded to the authorities for the principle that probable cause may emanate from the collective knowledge of the police though the officer who performs the act of arresting or searching may be far less informed. That principle is especially applicable here. The fact that the formal announcement of his arrest was not made until a moment (or perhaps even seconds later upon the appearance of Agent Smith) after his pocket was emptied is of no legal consequence. If he was in fact arrested prior thereto it was because his freedom of movement was restrained. It is that restraint which effectuates an arrest, not formal words or "station house bookkeeping." *See Dunaway v. United States,* 442 U.S. 200, 212, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979); *Reed v. United States,* 401 F.2d 756, 761 (8th Cir. 1968), *cert. denied,* 394 U.S. 1021, 89 S.Ct. 1637, 23 L.Ed.2d 48 (1969); *United States v. Skinner,* 412 F.2d 98, 103 (8th Cir.), *cert. denied,* 396 U.S. 967, 90 S.Ct. 448, 24 L.Ed.2d 433 (1969). Given the finding of probable cause to arrest Rueda, and where

it is clear that evidence seized in a contemporaneous search was not necessary to establish probable cause, the search is incidental to the arrest. The search is valid whether it took place moments before or moments after Agents Courtney and Smith formally announced Rueda's arrest. *United States v. Skinner, supra; United States v. Jenkins,* 496 F.2d 57, 73 (2d Cir. 1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975) ("The mere fact that the trooper reversed the procedure, conducting the search before the arrest did not render it illegal as long as probable cause to arrest existed at the time of the search).

■ The subsequent search of the automobile was lawful. The DEA agents had ample cause to believe that contraband was concealed somewhere within the Toyota and properly conducted a search of the vehicle that was as thorough as a Magistrate could authorize in a warrant "particularly describing the place to be searched." *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572. *See also United States v. Mejia,* 578 F.Supp. 1541 (E.D. N.Y.1984).

The motion to suppress the physical evidence is denied.

## C. *The Interrogation*

### 1. *Acosta-Rojas:*

■ The uncontradicted testimony at the suppression hearing was that Acosta-Rojas was advised of his *Miranda* rights by Agent Cavuto and he stated that he understood those rights. Any statements made by him during his custodial interrogation were made with full knowledge and understanding of his rights and were made voluntarily. The statement the defendant seeks to suppress, however, was not made in response to interrogation but was volunteered by him while furnishing pedigree information—namely, that he was approached by a man with a beard and asked if he could get cocaine—and then introduced "these people" in New York (Tr. 146). The motion, made by the defendant, to suppress his statements, is denied.

### 2. *Rueda:*

The defendant moved to suppress his statement that the cocaine came from Colombia (Tr. 183). The uncontradicted evidence elicited at the suppression hearing was that Rueda was advised of his *Miranda* rights in Spanish and indicated his understanding of those rights (Tr. 181–184, 216–218). His willingness to respond to questions thereafter was the manifestation of a knowing and voluntary waiver of those rights and his motion to suppress is denied.

■ Rueda contends that his statement that the drugs came from Colombia came at a point in the interrogation when he was told that drugs were found in his house and in the car and he was asked whether he knew where the drugs came from, to which he replied, "Colombia" (Tr. 183). Because the drugs seized from the house was incident to a warrantless search, he contends that the basis of the Agent's question was, in essence, fruit from a poisoned tree and that his answer should, therefore, be suppressed. At the time he was questioned, cocaine had already been seized from the car and that seizure was lawful. The government has represented that they do not intend to offer as evidence things seized from the house. Since the question as to the origin of the drugs lawfully seized from the car is not in any way tainted, the defendant's contention lacks merit.

### 3. *O'Connell:*

Immediately after his arrest and while being escorted to a DEA vehicle at the rear of the Sheraton parking lot, O'Connell was given his *Miranda* warnings (Tr. 290). Approximately ten minutes later, Agent Ball came to the rear of the parking lot and asked another agent whether O'Connell had been advised of his rights and was told that he was. Ball then asked him where the cocaine was, to which O'Connell replied he didn't know about cocaine. Ball then suggested that O'Connell would be well

advised to cooperate and detailed the evidence the DEA had against him thus far. He again asked O'Connell "where is the cocaine," and "what are you doing in the bar sitting with a shoulder bag?" O'Connell said: "That's all I'm supposed to do, come in, sit in a bar." (Tr. 328, 329). In response to other questions, O'Connell said he was doing a favor for Tony (the defendant Anthony Owens, a/k/a Tony Massai). Ball also asked O'Connell whether there was "any more dope up in the apartment?" to which he replied, "I don't think so." He was then asked, "Did you see any?" and replied, "I didn't." "Is there anybody else in the apartment?" to which he replied, "I don't know." He was asked, "Was anybody else there when you left?" and he replied, "I don't think so." Finally he was asked, "Did you see any weapons in the apartment?" to which he said, "No, I didn't."

■ Unquestionably, O'Connell was in custody when these questions were asked and they were asked of him after he was advised of his *Miranda* rights. O'Connell is an articulate, intelligent man (Tr. 332). He understood his *Miranda* rights and knew how to assert them. Indeed, a short while later, while being driven to DEA headquarters, he was again advised of his *Miranda* rights by DEA Agent Millar and expressly stated that he did not wish to waive them. In responding to Agent Ball's questions, O'Connell clearly manifested a knowing and voluntary waiver of his rights. With respect to that portion of the colloquy between Agent Ball and O'Connell that related to the desirability of O'Connell's cooperation, it has been held that such discussion is not inherently a form of questioning for purposes of *Miranda*. *United States v. Guido*, 704 F.2d 675 (2d Cir.1983). It has also been held that furnishing a suspect with details of the evidence against him does not constitute interrogation within the meaning of *Miranda*. *Guido, supra*. If defendant O'Connell were to contend that since the warrantless search of the apartment was illegal, questions put to him based upon information obtained from that search and the respons-

es thereto were fruits of a poisoned tree, his contention would have no merit.

■ The facts as found can leave no doubt that O'Connell, a Bostonian who had come to New York in connection with this transaction, had no reasonable expectation of privacy as to the Queens apartment and had no standing to contest the validity of the search of that apartment. It follows that the tree as to James O'Connell was not poisoned and neither were its fruits.

Knowledge of the likelihood that the Queens apartment was the place from which the cocaine had come was, in addition, already known to the DEA agents. They did follow Rueda, Acosta-Rojas and O'Connell there from LaGuardia Airport. Owens had indicated at the Sheraton that the drugs would arrive shortly. The blue Toyota and Rueda, O'Connell and Acosta-Rojas did arrive at the Sheraton and the drugs were in the car. Even absent a search, the agents had independent reason to believe that the apartment was the source of the drugs or, as it is known in that trade, the "stash pad."

The motion to suppress these statements is denied.

■ As has already been indicated, O'Connell was again advised of his *Miranda* rights by Agent Millar while being driven to DEA headquarters in Manhattan and chose not to waive them. After arriving at the headquarters, Millar proceeded to obtain pedigree information from O'Connell. It should be noted here that even if *Miranda* warnings had not been given, they need not be when pedigree or background data is being gathered. *United States v. Prewitt*, 553 F.2d 1082 (2d Cir.1977); *United States v. LaVallee*, 521 F.2d 1109 (2d Cir. 1975). During the course of obtaining this background data, O'Connell volunteered in a conversation he initiated himself, "All this for $500." (Tr. 90). O'Connell also asked whether he would obtain medical treatment for his many ailments in a federal institution if he were convicted. Agent Millar believed that he would and told him so (Tr. 87). Volunteered statements of any

kind and spontaneous, unprovoked, incriminating statements are not barred by the Fifth Amendment. *Guido, supra.* Nor would the response to O'Connell's questions about medical treatment be precluded.

After Agent Millar was completing the gathering of O'Connell's personal data, Agent Ball entered the room. In response to his question, Agent Millar told him that O'Connell "had his rights." Ball then asked O'Connell, "Do you understand your rights?" to which O'Connell responded, "Yes, I do." (Tr. 31). Ball asked him whether he knew that the case started out as a heroin case and if it had been, O'Connell "would be looking at a lot more exposure." O'Connell said, "I wish it was a heroin deal ... if it was, I wouldn't be here because I don't have anything to do with that stuff" (Tr. 332). O'Connell again asked whether he would receive needed medical attention in a federal institution if convicted and was told that he would. He also told Ball that he was involved because he needed the money. Ball again suggested that O'Connell cooperate and encouraged him to talk to his lawyer about it. (Tr. 333).

▆▆▆▆ O'Connell contends that after he advised Agent Millar that he did not wish to waive his *Miranda* rights, further questioning by Agent Ball thereafter was prohibited. When the *Miranda* court decreed that the interrogation must cease upon invocation of the right to silence, it did not create a *per se* proscription of in-definite duration upon any further questioning. *Wilson v. Henderson,* 584 F.2d 1185, 1187 (2d Cir.1978). Questioning can resume after new warnings are given and police may ask a defendant to reconsider his refusal to answer questions so long as such reconsideration is urged in a careful non-coercive manner at not too great length and in the context that a defendant's assertion of his right not to speak will be honored, it does not violate the *Miranda* mandate. *United States v. Collins,* 462 F.2d 792 (2d Cir.), *cert. denied,* 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 254 (1972). This is not a case in which the defendant was badgered by relentless interrogators and there is no evidence to suggest that O'Connell's will was overborne by persistent or coercive questioning. The defendant O'Connell's motion to suppress is, therefore, denied.[1]

*The Motion to Dismiss Pursuant to 18 U.S.C. § 3161(b)*

18 U.S.C. § 3161(b), provides in pertinent part:

> Any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested ... in connection with such charges.

▆▆▆ The defendants were arrested on December 5, 1984. The original one count indictment was filed on December 14, 1984 charging them with conspiracy to knowingly and intentionally distribute and possess

---

**1.** On March 4, 1985, *Oregon v. Elstad,* was decided by the Supreme Court and reported in — U.S. —, 105 S.Ct. 1285, 84 L.Ed.2d 222. The Court held that the Self-Incrimination Clause of the Fifth Amendment does not require the suppression of a confession made after proper *Miranda* warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary but unwarned admission from the suspect. "The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. *The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative."* — U.S. at —, 105 S.Ct. at 1298. (emphasis added). In an earlier portion of the opinion, the Court made this relevant observation:

> Once warned, the suspect is free to express his own volition in deciding whether or not to make a statement to the authorities. The Court has often noted that 'a living witness is not to be mechanically equated with the proffer of inanimate evidentiary objects illegally seized.... [T]he living witness is an individual human personality whose attributes of will, perception, memory and *volition* interact to determine what testimony he will give.' (citations omitted).

— U.S. —, 105 S.Ct. 1293.

with intent to distribute a substantial quantity of cocaine hydrochloride. On February 1, 1985, a superseding indictment was filed charging them in a second count with knowingly and intentionally possessing with intent to distribute a substantial quantity of cocaine hydrochloride. The superseding indictment was filed more than 30 days after their arrest and hence their motion to dismiss the second count of the superseding indictment.

The sanction for late filing of an indictment is to be found in 18 U.S.C. § 3162(a)(1) which reads in relevant part:

If, in the case of any individual against whom a complaint is filed charging such individual with an offense, no indictment or information is filed within the time limit required by section 3161(b) ..., *such charge against that individual contained in such complaint* shall be dismissed or otherwise dropped.... (emphasis added)

The complaint against the defendants which was filed on December 6, 1984 charges them *only* with conspiracy. The indictment as to that complaint was filed within the time prescribed by § 3161(b).

In *United States v. Pollock*, 726 F.2d 1456 (9th Cir.1984), the defendant was initially arrested and held to answer on the single charge of conspiracy to manufacture and distribute methamphetamine. He was subsequently indicted on 50 counts, some of which involved offenses based upon the same criminal episode, but most of which specified separate offenses discovered during the grand jury's investigation. The court said, at p. 1462:

We must decide which charges to dismiss when an indictment is not timely and the offenses specified in the indictment are not confined to those in the complaint. We hold that when the government fails to indict a defendant within 30 days of arrest, section 3162(a)(1) requires dismissal of only the offense or offenses charged in the original complaint.

This construction follows the clear meaning of the statutory language. Section 3162(a)(1) states that only "such charge

against that individual *contained in such complaint* shall be dismissed or otherwise dropped." (emphasis added). *Cf. United States v. Kripplebauer,* 463 F.Supp. 291 (E.D.Pa.1978) (arrest on one charge does not trigger the running of time on some other criminal offense). "Absent a clear indication of legislative intent to the contrary, the statutory language controls its construction." *Ford Motor Credit Co. v. Cenance,* 452 U.S. 155, 158 n. 3, 101 S.Ct. 2239, 2241 n. 3, 68 L.Ed.2d 744 (1981).

Moreover, Congress implicitly rejected the broad construction of the dismissal sanction urged by Pollock. Only in the initial draft of the Act did the bar against reprosecution apply to "that offense or any offense based on the same conduct or arising from the same criminal episode." *Partridge, supra,* at 32–33. This language would have required courts to engage in the complex task of investigating the relationship between the conduct underlying the offenses charged in the complaint and the conduct underlying the offenses listed in the indictment. The House Judiciary Committee confined the bar to those offenses "which were known or reasonably should have been known at the time of dismissal." Even this version would have forced courts to make an intrusive inquiry into what the prosecutor knew at various stages in the prosecution. The version of section 3162 actually passed by Congress, however, creates a sensible legal test that courts can efficiently apply. With the present more restrictive language the offenses to be dismissed are now apparent on the face of the complaint.

The decision in *Pollock* is precisely applicable here. Accordingly, the motion to dismiss the second count of the superseding indictment is denied. *See also United States v. Heldt,* 745 F.2d 1275 (9th Cir. 1984).

*The Defendant's Motion Pursuant to 18 U.S.C. § 3161(c)(2)*

18 U.S.C. § 3161(c)(2) provides:

Unless the defendant consents in writing to the contrary, the trial shall not commence less than thirty days from the date on which the defendant first appears through counsel. . . .

When the superseding indictment was filed on February 1, 1985, the trial was scheduled to commence on February 12th. Because of the variety of motions which have been filed, including the defendant Badr's motion for a continuance, the trial is currently scheduled to commence on March 11, later than the thirty days required by the statute. The motion is, therefore, moot. Were it otherwise, however, the resolution of that motion would have rested within the discretion of the court to direct the parties to trial without further delay. *United States v. Guzman,* 754 F.2d 482 (2d Cir.1985).

*O'Connell's Motion to Sever*

The defendant James O'Connell has moved pursuant to Rule 14 of the Fed.R. Crim.P. to sever his trial from the trial of his co-defendant, Adham Badr. The court is informed by counsel for O'Connell that his motion is joined in by co-defendants Acosta-Rojas and Rueda.

The basis upon which this motion is made is the understanding by O'Connell's counsel that co-defendant Badr's defense will be his claim that he ostensibly acted as a government agent during the negotiation of the drug transaction. Specifically, it is his understanding that Badr will assert that he was recruited by the informant to do a favor for a friend—do a good service for the government and make some money by assisting in the set-up of the drug transaction. O'Connell also asserts the likelihood that Badr will testify at trial thus compelling him (O'Connell) to defend against accusations of both the government and his co-defendant, Badr. He contends that would give rise to inconsistent and mutually exclusive defenses, thereby precluding the possibility of a fair trial. O'Connell has not made known his own defense nor has he specified how his and Badr's defense will necessarily conflict.

The determination of whether to grant or deny a motion for severance lies within the discretion of the court and should not be granted absent a showing of "substantial prejudice" resulting from its denial. Recognition dictated by reality is also given to the acceptability of a certain amount of prejudice given the judicial economies that result from a joinder. *United States v. Carpentier,* 689 F.2d 21, 27 (2d Cir.1982).

When the defendant seeks a severance based upon antagonistic defenses, a "simple showing of some antagonism between defendants' theories of defense does not require severance." *United States v. Potamitis,* 739 F.2d 784, 790 (2d Cir.1984); *Carpentier,* 689 F.2d at 27. The Second Circuit has endorsed the stringent test for a severance that was first enunciated by the Fifth Circuit in *United States v. Berkowitz,* 662 F.2d 1127, 1134 (5th Cir.1981). That test is:

> The defense of a defendant reaches a level of antagonism [with respect to the defense of a co-defendant] that compels severance of that defendant if the jury, in order to believe the core of testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant.

The decision in *Carpentier, supra,* dictates precisely the resolution of this motion. In that case, two defendants were indicted on charges of conspiracy and bribery in conjunction with a scheme to acquire a "green card" for an illegal alien. The indictments flowed from the ABSCAM investigation in which an FBI agent, through a paid informer, approached the defendant Carpentier who told the FBI agent that he could obtain green cards. Carpentier then arranged for the green card transaction with the other defendant, Alexandro. At trial, Alexandro asserted by way of defense that he pretended to go along with the illegal scheme in order to carry out his own investigation into corruption. The court rejected Carpentier's contention that this defense was prejudicial:

> It is difficult to see how Alexandro's defense that he was ferreting out corrup-

tion prejudiced Carpentier in the least; it certainly failed to rise to the standard enunciated by the *Berkowitz* court.... There appears to be no reason why the jury could not have believed Alexandro's story and yet still have found that Carpentier lacked the requisite intent to commit the crimes with which he was charged.

689 F.2d at 28.

In the present case, Badr, like Alexandro, is allegedly basing his defense on the claim that he was acting in an attempt to assist the government in investigating illegal activities. The reasoning of the court in *Carpentier* is precisely applicable. As has been indicated, O'Connell has failed to state the nature of his defense and to specify in what respect any antagonism of defenses exists. The same deficiency obtains as to Acosta-Rojas and Rueda. Where a defendant fails to state the nature of his defense and in which respect, if any, his defense is inconsistent with or antagonistic to that of his co-defendant, there is no basis for severance. *United States v. Pellon*, 475 F.Supp. 467, 482 (S.D.N.Y. 1979); *United States v. Wheaton*, 463 F.Supp. 1073, 1077 (S.D.N.Y.1979), *aff'd* 614 F.2d 1293 (2d Cir.1979). The motion for severance is, therefore, denied.

SO ORDERED.