**UNITED STATES of America, Appellee,**

v.

**Yagih ABOUMOUSSALLEM,**
**Defendant-Appellant.**

**No. 165, Docket 83–1139.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 13, 1983.

Decided Jan. 6, 1984.

Robert G. DelGrosso, Garden City, N.Y., for defendant-appellant.

William J. Cunningham, III, Asst. U.S. Atty. Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., L. Kevin Sheridan, Asst. U.S. Atty., Brooklyn, N.Y., on brief), for appellee.

Before FEINBERG, Chief Judge, and FRIENDLY and NEWMAN, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

Yagih Aboumoussallem ("Yagih") appeals from a judgment of conviction entered on April 14, 1983, in the District Court for the Eastern District of New York (I. Leo Glasser, Judge) following a jury verdict finding him guilty of importing and distributing heroin hydrochloride, in violation of 21 U.S.C. §§ 952(a), 960(a)(1), and 841(a)(1), and of conspiracy to do the same, 21 U.S.C. §§ 952(a), 960(a)(1), and 846. Yagih was sentenced to concurrent four-year terms on each count, and to a ten-year special parole term. Yagih appeals from the judgment of conviction on three grounds: (i) that the federal prosecution, following his acquittal on identical charges in a state proceeding, violated the Fifth Amendment's guarantee against double jeopardy, (ii) that statements by an alleged co-conspirator were improperly admitted at trial, and (iii) that evidence of prior similar acts by alleged co-conspirators tending to exculpate Yagih were improperly excluded. We reject appellant's contentions and affirm the judgment of the District Court.

### Facts

In April 1981, undercover agent Mark Gerbino of the Rochester police department, posing as an organized crime figure, purchased fourteen ounces of heroin from Nazih Aboumoussallem ("Nazih"), Yagih's cousin. Nazih identified Lebanon as the source of the heroin and told Gerbino that various family members based in Lebanon regularly transported drugs to the United States. Hoping to catch other participants in Nazih's drug smuggling scheme, Gerbino subsequently arranged for a more substantial purchase of heroin.

On August 17, 1981, Officer Gerbino and Nazih traveled to Kennedy Airport to await the arrival of Nazih's Lebanese "courier." Nazih informed Gerbino that his cousin Yagih would be transporting the heroin. Yagih, who would be wearing a blue T-shirt, was to deliver a black attache case containing heroin to whoever handed him a passport-size photograph of Yagih. Gerbino arranged for DEA Agent Silvestro, posing as a corrupt airline employee, to intercept Yagih as soon as he left the aircraft. As arranged, Yagih exchanged the attache case for his photograph.

Silvestro examined the attache case in a customs examination room. The contents of the case included a girdle, a shirt, Yagih's toiletries bag, two magazines, and a smuggler's vest containing 1,823 grams of 53.8% pure heroin. After reloading these items into the attache case, Silvestro met Yagih, Nazih, and Officer Gerbino at the Empire Airlines counter. The four boarded a flight to Rochester, the planned destination. On board, Nazih, Yagih, and Officer Gerbino sat together; DEA Agent Silvestro, with the attache case, sat by himself.

During the course of the flight Officer Gerbino posed a number of questions to Yagih. As Yagih spoke no English, and Gerbino no Arabic, Nazih acted as interpreter. In response to Gerbino's question regarding Yagih's journey from Lebanon, Nazih and Yagih both laughed as Yagih replied that the trip went fine but that at the Paris airport, while wearing the smuggler's vest, he requested directions from a French policeman. While speaking to Gerbino, Yagih moved his hands up and down his chest, indicating that he had worn the vest. In response to an inquiry as to the quality of the heroin, Yagih responded that it was so strong that when he and Pierre

Aboumoussallem (Nazih's brother) packed the heroin into the vest, their noses bled. Again, Yagih's gestures corroborated Nazih's translation—he moved his hands in a flowing manner in the area of his nose.

Upon arrival at the Rochester airport, the four men walked to Gerbino's automobile, located in the airport parking lot. Once inside the automobile, Silvestro asked to see the heroin. Yagih, at Nazih's instructions, opened the case and examined the vest. Yagih reported, through Nazih's translation, that the vest was intact. The undercover agents then sought to arrest Yagih and Nazih. Nazih resisted apprehension and was killed in a gun fight.

Yagih was indicted and tried under New York law on charges of criminal possession and criminal sale of a controlled substance in the first degree, N.Y. Penal Law §§ 20.00, 220.21, and 220.45 (McKinney 1975). Upon his acquittal by a jury in the state trial, Yagih was indicted for the federal offenses.

Yagih's defense at his trial on federal charges was that he was "duped" by his cousin Nazih. He testified that he had no knowledge that the attache case contained a smuggler's vest loaded with heroin. Yagih's version commences in June of 1981, when Nazih traveled to Lebanon. Yagih testified that, in the hope of securing medical treatment for his two deaf children, he accepted Nazih's suggestion that he make his first visit to the United States. Nazih offered to help Yagih obtain employment and medical assistance. At Nazih's request for a "souvenir" Yagih gave Nazih a passport-size photograph of himself.

Subsequently, as Yagih was about to board his flight from Beirut, Yagih was intercepted by Nazih's brother, Pierre. Pierre asked Yagih to deliver an attache case, which he said Nazih had mistakenly left in Lebanon, to a friend of Nazih's who would meet Yagih at Kennedy Airport. Pierre indicated that Nazih's friend would present Yagih with the passport-size photograph of himself he had given to Nazih. To facilitate identification, Yagih was to wear a blue T-shirt.

Yagih testified that he first opened the attache case just prior to landing in New York when, without inspecting its contents, he placed his toiletries and two magazines inside the case. Yagih testified that Nazih first informed him of the contraband cargo upon arrival in New York, when Nazih advised him that the case contained hashish and that Gerbino and Silvestro were affiliated with the Mafia. Yagih denied ever speaking with Officer Gerbino while en route to Rochester. He did admit that he inspected the smuggler's vest at the Rochester airport but maintained he did so at Nazih's instruction.

### Discussion

1. Appellant first argues that since he was acquitted by a New York State jury on New York State charges involving criminal sale and possession of heroin, the subsequent federal prosecution, based on the same underlying events, violates the Double Jeopardy Clause of the Fifth Amendment. Yagih maintains that double jeopardy concerns are particularly implicated in a case where, as here, the criminal activity is investigated by a joint federal-state task force, and the initial prosecution is pursued by the sovereign expected to impose greater sanctions.

The Supreme Court has long held that an acceptable cost of federalism, tolerable under principles of both double jeopardy and due process, is the risk of successive prosecutions by state and federal authorities for identical conduct. The so-called "dual sovereignty" principle is equally applicable whether the first prosecution results in acquittal, *Bartkus v. United States,* 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959), or conviction, *Abbate v. United States,* 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959). The continued vitality of this doctrine, recognized since as early as *Moore v. Illinois,* 55 U.S. (14 How.) 13, 14 L.Ed. 306 (1852),[1] has been recently reaffirmed by the

---

1. The difficulties raised by concurrent federal and state jurisdictions were first noted in *Houston v. Moore,* 18 U.S. (5 Wheat.) 1, 5 L.Ed. 19 (1820). The Supreme Court did not consider

Supreme Court. *United States v. Wheeler,* 435 U.S. 313, 320, 98 S.Ct. 1079, 1084, 55 L.Ed.2d 303 (1978).[2]

■ A narrow exception to the "dual sovereignty" doctrine, carved out in *Bartkus v. Illinois, supra,* bars a second prosecution where one prosecuting sovereign can be said to be acting as a "tool" of the other, *id.,* 359 U.S. at 123, 79 S.Ct. at 678, or where the second prosecution amounts to a "sham and a cover" for the first, *id.* at 124, 79 S.Ct. at 678. We need not refine the somewhat ambiguous contours of this qualification since Yagih's allegations fall far short of showing the sort of manipulation that could avoid the general rule. At most, there was here no more than a joint investigation of criminal activity, which we have held does not preclude separate prosecutions.[3] *United States v. Russotti,* 717 F.2d 27, 30–31 (2d Cir.1983); *United States v. Ng,* 699 F.2d 63, 70 (2d Cir.1983); *United States v. Mejias,* 552 F.2d 435, 441 (2d Cir.), *cert. denied,* 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 115 (1977).

2. Yagih also maintains that the District Court erred in permitting Officer Gerbino and Agent Silvestro to testify concerning conversations they had with Yagih, through the interpretation of Nazih, a co-conspirator. The incriminating conversations, as described above, directly undermined Yagih's defense of lack of knowledge.

■ The District Court admitted Nazih's translations as statements made by a co-conspirator in furtherance of the conspiracy, Fed.R.Evid. 801(d)(2)(E). Appellant contests admissibility absent proof that Nazih's alleged translation was reliable. Nazih's translations, communicated during the course of the crime to further the venture, are admissible statements of a co-conspirator. It is irrelevant for purposes of admissibility whether a co-conspirator's statement in furtherance of a conspiracy is an expression of his own thought or his account of what a defendant said. The defendant's statement is an admission, Fed.R.Evid. 801(d)(2)(A), and a report of that statement by a co-conspirator, if given in furtherance of the conspiracy, is not hearsay under Rule 801(d)(2)(E), whether the report is a contemporaneous translation or a subsequent recounting. In either event the accuracy of the co-conspirator's report is to be assessed by the jury on the basis of all the circumstances under which the report is made. Even if we were to require some indicia of reliability beyond the circumstance of a co-conspirator's making a report that furthers a conspiracy, we would be fully satisfied by Yagih's gestures, which corroborated key portions of Nazih's translation.

3. Finally, Yagih claims that the District Court improperly excluded as irrele-

this issue until the mid-19th century when it upheld the power of the state and federal governments to make the same conduct criminal. *United States v. Marigold,* 50 U.S. (9 How.) 560, 13 L.Ed. 257 (1850); *Moore v. Illinois,* 55 U.S. (14 How.) 13, 14 L.Ed. 306 (1852). The Court first upheld multiple prosecutions for identical conduct in *United States v. Lanza,* 260 U.S. 377, 382, 43 S.Ct. 141, 142, 67 L.Ed. 314 (1922).

2. The "dual sovereignty" doctrine is inapplicable where separate prosecuting entities exercise authority of the same sovereign. Thus, the double jeopardy clause bars separate prosecutions by city and state authorities, *Waller v. Florida,* 397 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 435 (1969) (city political subdivision of State), and by territorial and federal authorities, *Puerto Rico v. Shell Co.,* 302 U.S. 253, 264–66, 58 S.Ct. 167, 172–73, 82 L.Ed. 235 (1937) (territorial courts creatures of federal sovereign).

3. Yagih also alleged that the federal and state prosecutorial authorities agreed to have the State proceed first in the hope of obtaining the harsher State drug penalties. The United States Attorney represented that the federal authorities deferred to the State prosecutor because the underlying investigation had been initiated by the Rochester Police Department, and that federal prosecution was never considered until after Yagih's acquittal on State charges. Even if federal prosecutors had previously agreed that the state prosecution should proceed first in the expectation that substantial punishment would be imposed, the federal prosecutors would not thereby be "manipulating" a state prosecution in any sense that might implicate double jeopardy or due process concerns. *See United States v. Liddy,* 542 F.2d 76, 79 (D.C.Cir.1976).

vant evidence tending to corroborate Yagih's defense that he was unwittingly "duped" into transporting contraband by his co-conspirator cousins, Nazih and Pierre Aboumoussallem. Yagih offered to prove that five and a half months prior to his arrest Nazih and Pierre similarly duped Wendy Golding into transporting hashish oil from Lebanon into the United States. Golding had been arrested on March 1, 1981, after a Customs examination at Kennedy Airport uncovered 8 kilograms of hashish oil concealed inside 8 cigarette cartons. She would have testified that Pierre Aboumoussallem controlled her baggage for several hours prior to her departure from Beirut airport and that, without her knowledge, he placed the hashish oil in her luggage. Another witness, Sam Mina, would have confirmed Golding's testimony. He would have testified that on the day of Golding's arrest Nazih informed him that Golding was innocent and that "my people set it up and we duped her to bring it in." Yagih offered this evidence, pursuant to Fed.R.Evid. 404(b), as prior similar acts evidencing a common plan to import narcotics from Lebanon using innocent dupes.

The District Court initially rejected the proposed testimony solely on relevancy grounds; Judge Glasser stated that the fact that Golding had been duped was not relevant "on the question as to whether this defendant was too." Upon further reflection, the Court concluded that even if relevant, the offered testimony was excludable under Fed.R.Evid. 403 as "terribly confusing and terribly prejudicial." Judge Glasser found no merit to Yagih's contention that the testimony was admissible under Rule 404(b); the District Judge stated that the Rule did not mandate admission of evidence of similar acts probative of a third party's intent, motive, common scheme or plan for the purpose of proving defendant's lack thereof. Apparently assuming that Rule 404(b) mandates a symmetrical standard for the admission of similar acts evidence, the District Court accepted the prosecution's argument that since the Govern-

ment could not have offered evidence that Nazih followed a plan of employing "knowing couriers" to prove that Yagih knew of the heroin, Yagih's parallel offer concerning a duped courier was likewise precluded by the Rule as evidence that he lacked knowledge.

■ Whether or not evidence concerning a co-conspirator's "plan" to inform his couriers could be introduced by a prosecutor to prove a defendant's knowledge, we believe the standard of admissibility when a criminal defendant offers similar acts evidence as a shield need not be as restrictive as when a prosecutor uses such evidence as a sword. The prosecution, in the Anglo-American tradition, may not ordinarily offer evidence of a defendant's prior wrongdoing for the purpose of persuading the jury that the defendant has a propensity for crime and is therefore likely to have committed the offense for which he stands trial. 1A Wigmore, *Evidence* § 58.2 (Tillers rev. 1983). As Dean Wigmore points out, the evidence "is objectionable not because it has no appreciable probative value but because it has too much." *Id.* at 1212. Presumably, the "too much" argument means that a guilty person, and, of far more serious concern, an innocent person, may be convicted primarily because of the jury's willingness to assume his present guilt from his prior misdeed. Wigmore also identifies objections based on the risk that the jury will convict because the defendant may not have been punished for his prior offenses and the injustice of requiring the defendant to defend against a series of accusations. *Id.* at 1215. These possibilities of prejudice must be assessed even in cases where the prosecutor offers similar acts evidence, not to prove the character of the accused, but to prove one of the permissible subsidiary facts listed in Rule 404(b), such as intent or plan, *United States v. Figueroa,* 618 F.2d 934, 943 (2d Cir.1980). However, risks of prejudice are normally absent when the defendant offers similar acts evidence of a third party to prove some fact pertinent to the defense.[4] *See People v. Flowers,* 644

4. Such risk might well arise if the similar acts     evidence concerned prior acts of a co-defendant

P.2d 916 (Colo.), *appeal dismissed,* 459 U.S. 803, 103 S.Ct. 25, 74 L.Ed.2d 41 (1982); *State v. Garfole,* 76 N.J. 445, 388 A.2d 587 (1978). In such cases the only issue arising under Rule 404(b) is whether the evidence is relevant to the existence or non-existence of some fact pertinent to the defense.[5]

On numerous occasions federal and state courts have admitted similar acts evidence offered for defensive purposes. In *United States v. McClure,* 546 F.2d 670 (5th Cir. 1977), the trial judge had rejected as irrelevant an accused drug dealer's proposed evidence that a DEA informer coerced three other individuals into selling drugs to undercover DEA agents. The Fifth Circuit reversed. The Court held that under Rule 404(b) "evidence of a systematic campaign of threats and intimidation against other persons is admissible to show lack of criminal intent by a defendant who claims to have been illegally coerced." *Id.* at 672–73. In *United States v. Robinson,* 544 F.2d 110 (2d Cir.1976), *cert. denied,* 434 U.S. 1050, 98 S.Ct. 901, 54 L.Ed.2d 803 (1978), this Court found error in the trial court's refusal to permit an accused bank robber to prove mistaken identity by showing that a third man, who resembled the accused, had committed two other bank robberies six days prior to the robbery at issue. *See also State v. Garfole, supra; State v. Bock,* 229 Minn. 449, 39 N.W.2d 887 (1949); *Commonwealth v. Murphy,* 282 Mass. 593, 185 N.E. 486 (1933); *see also* 2 Wigmore, *Evidence* §§ 304, 341 (Chadbourn rev. 1979).

■■■ We disagree with the District Court to the extent it excluded the proposed testimony as irrelevant or as inadmissible under Rule 404(b). The proffered evidence satisfies the liberal relevancy standard of the Federal Rules of Evidence: It tends to make the existence of a consequen-tial fact, Yagih's knowledge, less probable. What Yagih sought to prove was that Nazih and Pierre had a plan to import narcotics from Lebanon into the United States using duped couriers. The existence of such a plan would lend some support to the inference that Yagih was duped and thereby bolster his defense of lack of knowledge.[6]

■■■ Though admissible under Rule 404(b), relevant evidence may be excluded under Rule 403 if its probative value is substantially outweighed by "the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay ...." Fed.R.Evid. 403. Judge Glasser cited as an independent ground for exclusion the risk of unfair prejudice and jury confusion. While we have rejected the former concern and consider the latter concern somewhat exaggerated, we are reluctant to substitute our judgment for that of the trial judge. Judge Glasser feared that the proposed testimony would require the jury to consider whether Golding in fact lacked knowledge of the concealed narcotics, in effect, a "trial within a trial." The District Court concluded that the adverse consequences of jury confusion and trial delay outweighed the benefits of the evidence to Yagih. The testimony of Golding and Mina, and rebutting evidence, if presented, would probably not have consumed much time nor greatly perplexed the jury. Yet, as the Government contends, evidence that several months earlier Nazih duped a stranger did not have much probative force to show that he duped his cousin Yagih. We accord trial judges considerable discretion in balancing the Rule 403 factors, *See, e.g., United States v. Margiotta,* 662 F.2d 131, 142 (2d Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 1891, 77 L.Ed.2d 282

---

in a joint trial or a party opponent in a civil case.

**5.** Our construction of Rule 404(b) is consistent with other provisions of the rules of evidence that adopt a similar asymmetric approach out of concern over prejudice to the criminal defendant. For example, Rule 609 permits impeachment of witnesses by evidence of conviction of crime provided the probative value of admitting this evidence outweighs its prejudicial effect to the *defendant.*

**6.** Relevant evidence encompasses evidence tending to establish negative as well as positive facts. *See United States v. Fearn,* 589 F.2d 1316, 1323 n. 5 (7th Cir.1978); *DeMarines v. K.L.M. Royal Dutch Airlines,* 580 F.2d 1193 (3d Cir.1978).

(1983), and, though the issue is somewhat close, we find no abuse of that discretion in this case.

Accordingly, the judgment of conviction is affirmed.