**UNITED STATES of America**

v.

**Harry B. HELMSLEY, Leona M. Helmsley, Joseph V. Licari, and Frank J. Turco, Defendants.**

**No. 88 Cr. 219 (JMW).**

United States District Court, S.D. New York.

July 5, 1989.

---

James R. DeVita and Cathy Seibel, Asst. U.S. Attys., and Diane M. Peress and Alfredo F. Mendez, New York City, Sp. Asst. U.S. Attys., for U.S.

John R. Wing and Harris Yale, Weil, Gotshal & Manges, New York City, for defendant Harry B. Helmsley.

Gerald Feffer, James R. Bruton, Eva Petko and Karen Zacharia, Williams & Connolly, Washington, D.C., for defendant Leona M. Helmsley.

Joseph Benfante, New York City, for defendant Joseph V. Licari.

William Brodsky, Baden, Kramer, Huffman & Brodsky, P.C., New York City, for defendant Frank J. Turco.

## OPINION AND ORDER

WALKER, District Judge:

### I. BACKGROUND

In April of 1988, a federal grand jury returned a forty-seven count indictment against the named defendants. Defendant Harry B. Helmsley is the President and sole shareholder of Helmsley Enterprises, Inc. ("Helmsley Enterprises"). Defendant Leona M. Helmsley, who is married to Harry Helmsley, is the President of Helmsley Hotels, Inc. ("Helmsley Hotels"), a wholly owned subsidiary of Helmsley Enterprises. The indictment covers the period from June 1983 until approximately October 1986. Until May 19, 1986, defendant Joseph V. Licari was senior Vice President and Chief Financial Officer of Helmsley Enterprises. Until February 12, 1986, defendant Frank J. Turco was Vice President and Chief of Financial Services for Helmsley Hotels.

The indictment charges the defendants with conspiracy to defraud the United States and the Internal Revenue Service

("IRS"), tax evasion or the aiding and abetting thereof, filing false corporate and personal tax returns and/or the aiding and abetting thereof, and mail fraud. The alleged tax crimes and mail fraud revolve around Dunnellen Hall, the Helmsleys' estate in Greenwich, Connecticut. In brief, the government charges that the defendants conspired to defraud the IRS by concealing income to the Helmsleys by having company payments for Dunnellen Hall disguised as legitimate company business expenditures, chiefly through the use of false invoices. The government also contends that various Helmsley entities then took improper business deductions on their corporate tax returns.

In a separate count, the indictment also charges defendants Leona Helmsley and Frank Turco with conspiracy to commit extortion. The government generally alleges that these defendants conspired to obtain kickbacks in the form of money, goods and services from contractors and vendors doing business, or seeking to do business, with Helmsley Enterprises and Helmsley Hotels, under a threat that the business of the Helmsley entities would be withheld unless such kickbacks were paid.

The filing of the indictment and subsequent proceedings in this case have received widespread publicity in New York and elsewhere due to the great public interest in the Helmsley defendants, whose name and wealth are well known features of New York life.

The Court now considers certain pretrial motions made by the defendants.[1]

## II. DISCUSSION

### A. *Defendant Harry Helmsley's Motion for a Continuance:*

#### 1. Background:

In September of 1988, defendant Harry B. Helmsley, who is 80 years old, moved before this Court for a continuance *sine die* of his trial on the ground that his medical condition renders him unable to assist properly in his own defense. In layman's terms, defendant Helmsley requested that the government's case against him be indefinitely postponed. His motion also necessarily contemplated a severance of his case from the case against his co-defendants, Leona Helmsley, Joseph Licari and Frank Turco. The defendant moved pursuant to 18 U.S.C. §§ 3161(h)(8)(A) and (B)(i), which provide, in relevant part, for a continuance, or postponement, where the court has determined that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial, in particular where the failure to grant such a continuance in the proceeding would be likely to result in a miscarriage of justice. Because this ruling does not affect the trial against Harry Helmsley's co-defendants, the public's interest in seeing this case tried will not be substantially affected by a continuance of the government's case against Harry Helmsley alone. The Court also acts pursuant to 18 U.S.C. § 4241.[2]

By September of 1988, at least four medical experts, including neurologists and neuropsychologists from the New York medical community retained by both the defendant and by the government, had re-

---

**1.** This opinion memorializes rulings on certain pretrial motions previously announced by this Court. After argument and the consideration of submissions from all parties, the Court ruled on these motions from the bench. The transcripts from those hearings and arguments of course remain part of the official record of this case. The first motion was originally decided on June 6, 1989; the remaining motions were decided on June 28, June 29 and July 5, 1989, respectively. Also on July 5, the trial in this case began with opening statements.

**2.** 18 U.S.C. § 4241(a) provides, in relevant part, that

the defendant or [the government] may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

cently examined Harry Helmsley. Their examinations tended to support the defendant's motion; those experts generally concluded that he was unable to assist properly in his own defense.[3] However, given the importance of this motion, certain equivocal language in at least one of the reports previously submitted to the Court, and the defendant's well-known and sizable charitable contributions to medical institutions in the New York area, the Court determined—and counsel for all parties agreed—that an impartial medical examination by an independent physician appointed by the Court from outside the New York area would assist the Court in deciding the present motion. Accordingly, on September 22, 1988, the Court appointed as an expert witness Dr. Martin Albert, Professor of Neurology and Director of Behavioral Neurosciences and Geriatric Neurology at the Boston University School of Medicine.[4] Dr. Albert agreed to examine the defendant on the occasions designated by the Court, to file reports of those examinations with the Court, and to provide testimony in open court as deemed necessary. Dr. Albert is widely recognized as a leading expert in the field of geriatric neurology and is the author of dozens of well-received books and articles in his field of expertise.[5]

The Court also directed the defendant to make available to Dr. Albert all requested medical reports and records relating to the defendant's condition, including those previously furnished to the Court by all parties. Pursuant to Fed.R.Evid. 706, the order also provided for Dr. Albert to receive appropriate compensation from the Court.

After having been provided with all relevant medical records, Dr. Albert examined Harry Helmsley in late September of 1988, and immediately thereafter submitted a report to the Court. At that time, the trial in this case was also scheduled to begin in September. The conclusions reached by Dr. Albert last September pointed to significant thought and memory impairments apparently resulting from a series of strokes that, without improvement, could significantly affect the defendant's ability to assist in his own defense and thus receive a fair trial.

Subsequent to that first examination, the trial was necessarily postponed when the defendants sought interlocutory appellate review of a pretrial ruling that was unrelated to Harry Helmsley's health. After the Second Circuit Court of Appeals dismissed that appeal as raising an issue that was unreviewable pretrial, the defendants sought a writ of certiorari in the Supreme Court. Several months after that, the Supreme Court reached the same conclusion as the Court of Appeals. The trial was then rescheduled, due consideration being given to the commitments of counsel that had arisen in the interim, with jury selection to begin on June 26, 1989.

From the start, it has been this Court's intention to rule shortly before trial on the defendant's motion for a continuance. In that way, the Court hoped to ensure that its decision on this motion would be based on the most current—and thus most meaningful—medical evidence. Thus, as the trial was postponed, so too were today's hear-

---

**3.** At the defendant's request, examinations were conducted, and reports were prepared, by Dr. Alan Kluger, a Neuropsychologist at New York University Medical Center, and Dr. Ajax George, also of New York University Medical Center. Dr. Kluger concluded that significant declines in the defendant's level of cognitive function have occurred over the past twenty-one months and that the defendant would have great difficulty in competently participating in his own defense. Dr. George reached a conclusion consistent with Dr. Kluger's findings.

At the government's request, the defendant was then examined by Dr. Arthur Kay, the Director of the Department of Neurology at the Brookdale Hospital Medical Center. Dr. Kay, too, reached the same conclusion as Dr. Kluger.

Finally, at Dr. Kay's request, Dr. Jane Healey, a Neuropsychologist at Mount Sinai Medical Center, examined the defendant. Her conclusions were more equivocal than those reached by the three previous doctors who had examined the defendant.

**4.** The Court's decision to appoint Dr. Albert was not in any way intended to question the integrity or expertise of those doctors who had previously examined the defendant.

**5.** The Court will not repeat here Dr. Albert's extensive qualifications as an expert. His *curriculum vitae* remains part of the official record of the June 6, 1989 hearing.

ing and Dr. Albert's reexamination of Harry Helmsley, which was scheduled to determine whether any change or improvement had occurred in the defendant's condition.

The present motion is critical because, if it results in a severance and an indefinite continuance of the prosecution against this defendant, then there is a high probability that the case against him will never be tried. This, of course, is an undesirable outcome because it deprives the government of the opportunity to obtain a conviction of an important defendant in an important case, and it deprives the defendant of the opportunity to clear his name.

Dr. Albert conducted his second examination of the defendant on the morning of June 6 and then testified in open court that afternoon. The Court will only summarize his findings and conclusions, since the complete transcript of his extensive testimony is in the official record.[6]

In recent years, Harry Helmsley has suffered a series of strokes, which, while not sufficiently severe to affect seriously his motor functions, have nonetheless caused substantial brain damage. He presently suffers from a marked slowness of thought processing, or bradyphrenia. He has a significant reduction in both recent and remote memory.

According to Dr. Albert, the defendant's inconsistent performance on memory tasks is the result of his difficulties with alertness and mental flexibility. He has real word-finding deficits. In Dr. Albert's words, the defendant "falls apart with free floating, wide-ranging conversation demanding problem solving in new situations." Dr. Albert has concluded that the defendant suffers from moderately severe dementia; that he "definitely" has cognitive impairment on a neurological basis, including memory difficulties and difficulties in reasoning and problem solving in new and rapidly shifting settings; and that he would not be cognitively fit to respond to a hostile cross-examination.

In sum, Dr. Albert has concluded that the defendant's memory impairments and his difficulty in fully integrating, in a meaningful way, recently presented facts render him unable to assist substantially in his own defense. This is so particularly in a case, such as this, that promises a trial of at least eight weeks, during which time dozens of witnesses will testify and thousands of pages of documentary evidence will be introduced, and which necessarily will require close and careful scrutiny of many complicated financial transactions.

It is important to note that the Court, as well as the government, questioned Dr. Albert carefully and at length about the possibility that the defendant had simulated his responses to various tests in a conscious effort to avoid prosecution. Dr. Albert rejected that possibility:

> There are a number of tests for cognitive function which were developed in [my] own department, and which are not widely published but for which we have extensive statistical documentation. It would be most unusual, unless someone actually came into our department and read [the] material in our files, for individuals to know how to perform ... on these various tests of cognitive function, visiospatial tests, memory tests [and] language tests, and to know how it would lead in our evaluation, or where it would lead in our evaluation ... [T]his is one means among several for overcoming [that] problem—the question of motivational causes for underlying cognitive impairment. There are other means as well ... [Certain other tests] are very difficult, if not impossible, to simulate."

Tr. at 28–29.

In this context, the Court also notes that when he examined the defendant in August of 1988, Dr. Kay, a government expert, reached the same conclusion that Dr. Albert reached after two separate examinations of the defendant. At the hearing, the government did not take a position adverse to Dr. Albert nor did it dispute his findings or conclusions.

### 2. Discussion:

Fifteen years ago, the Chief Judge of the Second Circuit Court of Appeals addressed the precise issue now before this Court:

---

**6.** By making this motion, the defendant necessarily waives the doctor-patient privilege.

Whether a defendant's physical condition is so poor as to require a continuance or severance is not only a difficult determination for a judge to make, but it is one which carries with it the tremendous responsibility of weighing the invariably unpredictable factor of a defendant's health against the Government's, indeed the public's, legitimate interest in a fair and speedy disposition. Troublesome though it may be, however, that decision, as we have repeatedly held, is one reserved to the sound discretion of the district judge.

*Bernstein v. Travia*, 495 F.2d 1180, 1182 (2d Cir.1974) (citations omitted) (Kaufman, C.J.). The Supreme Court has explained that "[i]t has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103. The prohibition against forcing such a defendant to proceed to trial, the Supreme Court concluded, "is fundamental to an adversary system of justice." *Id.* at 172, 95 S.Ct. at 904. On another occasion, the Supreme Court determined that "it is not enough ... that the defendant is oriented to time and place and has some recollection of events ... [T]he test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (citation omitted).

Several purposes are served by this rule that bars trying a defendant who remains unable to assist in his own defense. First, it helps safeguard the accuracy of any adjudication. Second, and more important, as the Supreme Court has recognized, it preserves the fundamental rights of the defendant. Those rights include his right to consult with counsel, to testify in his own behalf, to confront hostile witnesses and generally to comprehend the evidence presented against him at trial.

■ After carefully reviewing the documentary evidence submitted previously, including two separate reports prepared by Dr. Albert, after carefully considering Dr. Albert's testimony at the hearing on the present motion, as well as the findings and conclusions of the four medical experts—proffered by both sides—who are not in substantial disagreement, this Court concludes that the current medical condition of the defendant Harry Helmsley effectively deprives him of those rights without which the trial against him cannot proceed. To try this defendant would deprive him of his basic rights under the Sixth Amendment to assist in his own defense.

■ In our system of justice, just as every defendant has an absolute right to the presumption of innocence and to counsel, every defendant has a right to assist in his own defense. This includes assistance in counsel's cross-examination of witnesses, in the selection and preparation of defense witnesses, and in the decision whether the defendant should take the stand. When a defendant is incapable of rendering such assistance in any substantial or meaningful way, there can still be a trial, to be sure—but it would not be a fair one under our Constitution, and any conviction would be inherently defective. This is not because there may be no evidence of guilt, but rather because the defendant would have been denied a fundamental right that must always be available to all defendants. If left standing, such a conviction would violate the constitutional guarantee of due process and the principles of justice on which our society is based, and which predate even our Constitution. *See Drope v. Missouri*, 420 U.S. at 171, 95 S.Ct. at 903.

Just as no man by position or wealth stands above the law, so too will no man who is unfit to stand trial be subjected to a trial simply because the public's interest in his case is great, or simply because people may mistakenly conclude that the system enables a wealthy man to avoid the consequences of his conduct. A far more dangerous consequence to the judicial system,

with far greater and lasting damage, would result if the public were to see a man, charged with serious offenses, tried over the course of many weeks, and finally left to face possible conviction and a sentence of imprisonment—all the while sitting by silently, without adequate comprehension of the proceedings, unable to assist in his own defense.

Accordingly, the Court grants defendant Harry Helmsley's motion for a continuance *sine die*, finding that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. Further, the charges against this defendant are thus necessarily severed from those of his co-defendants. Nothing in this ruling precludes the possibility that Harry Helmsley may ultimately face trial on the charges contained in the indictment if his health improves. However, the Court would be less than candid if it indicated a belief that such an improvement will occur. Indeed, the available evidence and medical experts suggest that, for all practical purposes, this order will remain the final ruling in the government's case against this defendant.

## B. *Defendant Leona Helmsley's Motion for a Severance:*

Defendant Leona Helmsley renews her motion for a severance from her co-defendant Frank Turco. She moves pursuant to Fed.R.Crim.P. 14, which provides, in relevant part, that

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may ... grant a severance of defendants or provide whatever other relief justice requires.

On two prior occasions, this Court has denied similar defense motions without prejudice. On those occasions, the Court permitted the defendant to renew her application if it appeared, as further evidence developed, that a severance was warranted.

On this motion, defendant bears an extremely heavy burden. As Judge Weinfeld has explained,

Any analysis of ... requests for severance [under Rule 14] must begin from the proposition, repeatedly expressed in the decisions of our Court of Appeals, that defendants who are indicted together will normally be tried together.

*United States v. Ianniello*, 621 F.Supp. 1455, 1477 (S.D.N.Y.1985), *aff'd*, 808 F.2d 184 (2d Cir.1986), *cert. denied*, 483 U.S. 1006, 107 S.Ct. 3229, 97 L.Ed.2d 736 (1987). The Second Circuit has left no doubt that "a certain amount of prejudice is regarded as acceptable given the judicial economies that result from joinder," *United States v. Carpentier*, 689 F.2d 21, 27 (2d Cir.1982), *cert. denied*, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 957 (1983), particularly in a case where defendants are charged with participating in a single conspiracy, as are defendants Helmsley and Turco. *See, e.g., United States v. Uroquiza*, 575 F.Supp. 1538, 1540 (S.D.N.Y.1983).

To succeed on this application, then, defendant must demonstrate that she would suffer "substantial prejudice ... as a result of ... joinder, not [merely] that [she] might have ... a better chance for acquittal at a separate trial." *United States v. Corr*, 543 F.2d 1042, 1052 (2d Cir.1976) (citations omitted). As the Second Circuit has explained, "[T]he defense of a defendant reaches a level of antagonism ... that compels severance of that defendant, if the jury, in order to believe the core of testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant." *United States v. Carpentier*, 689 F.2d 21, 28 (2d Cir.1982), *cert. denied*, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 957 (1983) (citation omitted).

As on previous occasions, the basis for the severance sought remains a collection of alleged prior bad acts of defendant Turco. Those include acts of alleged embezzlement, extortion and theft not charged in the indictment. Since the Court last addressed defendant's severance motion, she has learned of an additional five such al-

leged acts. Certain of those prior bad acts were discovered by the government and reported to the defendants. The defendant learned of additional acts through interviews of government witnesses. In her supporting papers, she addresses these alleged bad acts in some detail. As defendant argues, "[I]t is essential to Mrs. Helmsley's right to a fair trial that she have an unencumbered right to place all of the evidence of Turco's other crimes before the jury to support her defense that the charges in the indictment were a product of his activities, rather than hers." Helmsley Mem. at 2.

The defendant relies primarily on the Second Circuit's decision in *United States v. Aboumoussallem*, 726 F.2d 906 (2d Cir. 1984), as well as the recent decision by Justice Bradley—who is presiding over a virtually identical state case against these same defendants—to sever defendants Turco and Licari for a separate trial from defendants Harry and Leona Helmsley.

In *Aboumoussallem*, the Second Circuit addressed a criminal defendant's right to introduce potentially exculpatory evidence of the prior bad acts of another. The Court there explained that such a defendant confronted a less burdensome standard than would a prosecutor who sought to introduce the exact same evidence pursuant to Fed.R.Evid. 404(b). As Judge Newman explained, "[W]e believe the standard of admissibility when a criminal defendant offers similar acts evidence as a shield need not be as restrictive as when a prosecutor uses such evidence as a sword ... [R]isks of prejudice are normally absent when the defendant offers similar acts evidence of a third party to prove some fact pertinent to the defense." 726 F.2d at 911 (citations omitted). In that case, a single defendant was on trial, and the Second Circuit noted that "[s]uch [a] risk [of prejudice, absent where defendant offers similar acts evidence of a third party to prove some fact pertinent to the defense,] might well arise if the similar acts evidence concerned prior acts of a co-defendant in a joint trial ..."

In support of her motion for a severance, the defendant juxtaposes *Aboumoussallem*—which, she argues, affords her the right to introduce evidence of her co-defendant's alleged prior bad acts—to Fed.R. Evid. 403, which bars any evidence the "probative value [of which] is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ..." She contends that, whenever she attempts to offer evidence during trial of Turco's alleged prior bad acts, her co-defendant will object pursuant to Rule 403, arguing that under Rule 403 the risk of unfair prejudice to him would outweigh its probative value.

Throughout a joint trial, then, Helmsley argues, the Court would face the dilemma of either (1) excluding evidence of uncharged criminal wrongdoing as unduly prejudicial, confusing, or misleading, *or* (2) permitting such evidence as necessary to ensure defendant Helmsley's constitutional right to present what she contends is relevant and exculpatory evidence to the jury in furtherance of her defense.[7] She argues, in brief, that course (1) impermissibly prejudices her, and course (2) unfairly prejudices Turco.

■ Upon careful reflection, this Court sees no reason to alter its prior rulings. The defendant has not demonstrated that a continued joinder of all defendants would substantially prejudice her rights to a fair trial.

It is first important to note that *Aboumoussallem* is readily distinguished on its facts. There, the principal fact issue remained the defendant's knowledge that an attache case that he brought into the country contained heroin. While declining to reverse the convictions, the Second Circuit expressed sympathy for the defendant's right to show that the heroin supplier, who had given him the attache case, had a *modus operandi* of duping couriers, like defendant himself, to import illegal drugs.

---

7. Another possibility, of course, exists as well: the evidence at issue might be deemed relevant and admissible as not unduly prejudicial.

In this Court's judgment, at least judging from the submissions currently before it, the facts of *Aboumoussallem* present a far more obvious candidate for the principle articulated by Judge Newman than is present here.

Here, the government apparently intends to prove direct knowledge by defendant Helmsley of her co-defendants' allegedly illegal acts in furtherance of the common conspiracy. The mere fact that, in a joint trial, one defendant may argue that another defendant is responsible for all crimes charged based in part upon evidence that the second defendant engaged in additional crimes not charged in the indictment, does not provide a sufficient foundation—at least pretrial—to establish the "substantial prejudice" that must be shown before a severance is granted.

In addition, a severance of Turco from this case would result in unnecessary and enormous prejudice to the government, which has the right to try a properly charged conspiracy at one time. There has been an insufficient showing to justify what would be two largely identical federal trials.

The defendant also notes that, in the related New York state criminal prosecution, Justice Bradley ordered a severance. The Court has carefully reviewed Justice Bradley's decision of April 24, and the cases upon which he relied. With all due respect, Justice Bradley sits across the street, not upstairs, and reasonable minds can disagree. For the reasons set forth above, this Court declines to follow Justice Bradley's lead.

However, by this ruling, the Court does not intend to restrict Helmsley's defense. Under a liberal relevancy standard which permits evidence if it tends to make the existence of a consequential fact more or less probable, *see Aboumoussallem*, 726 F.2d at 912, the Court may well determine that evidence of Turco's alleged prior bad acts are both relevant and admissible, under either the Rule 404(b) standard or the standard articulated in *Aboumoussallem*. This trial will last for at least two and perhaps as many as three months. There will be dozens of witnesses and hundreds of exhibits. The Court cannot decide today whether certain evidence is or is not relevant, much less admissible. Evidence of certain prior acts of Turco may or may not be too removed in time or place, or may or may not bear on an alleged *modus operandi*.

Defendant Helmsley's motion is not only premature, but under these circumstances such a motion should properly be made, if at all, by defendant Turco. In other words, if Helmsley convinces the Court, as the trial progresses, that evidence of Turco's prior bad acts is relevant to her defense, then the Court will determine whether that evidence should be admitted, under either the Rule 404(b) or *Aboumoussallem* standard. If the Court determines that the evidence is not relevant to Helmsley's defense, then the matter ends.

If, however, the Court does deem such evidence relevant, and does decide to admit that evidence, then Turco remains free to object. By letter dated June 23, 1989, and again by letter dated June 29, Turco renews his own motion for a severance. The Court reserves decision on that motion. In the meantime, the Court will give limiting instructions as requested and where appropriate. If, as the trial progresses, the Court concludes that Turco's rights are being unduly prejudiced, then the Court of course will grant his motion for a severance.

The Court deems exaggerated the procedural worries articulated by Helmsley's counsel. They fear that they will have to preview in court their cross-examination of each government witness, and their direct examination of each defense witness. The Court anticipates no such detailed "preview." The Court will address any motion to exclude or permit certain evidence at any time throughout the trial as issues arise.

As far as counsel's opening statement on behalf of defendant Helmsley is concerned, he remains free to argue that his client was completely unaware of her employees' conduct and actions, and that at all times relevant to the indictment they acted with-

out her authorization. He remains similarly free to promise what he believes the evidence will show—although, like *any* lawyer on *any* opening statement, he runs the calculated risk that certain evidence ultimately will not be admitted and that his credibility with the jury might suffer as a result. The Court encourages counsel not to be too specific on his opening lest he fail to deliver on every specific item.

The Court will determine the admissibility of specific similar acts evidence at the appropriate time. In this regard, certain witnesses may remain under subpoena and may well return to the witness stand after various evidentiary rulings have been made by the Court. The closing arguments of all counsel certainly may take into account any and all admitted evidence.

Accordingly, and for the reasons set forth above, the defendant's renewed motion for a severance is denied.

## C. *Defendant Leona Helmsley's Motion for a Change of Venue:*

Defendant Leona Helmsley also renews her motion, pursuant to Fed.R.Crim.P. 21(a), for a change of venue to the Eastern District of Pennsylvania, or Philadelphia. Rule 21(a) provides, in relevant part, that

[t]he court ... shall transfer the proceeding ... to another district ... if the court is satisfied that there exists in the district where the prosecution is pending *so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial* [emphasis added] at any place fixed by law for holding court in that district.

This Court denied the defendant's original motion, made on August 19, 1988. Since that time, she argues, not only have more than 300 additional stories appeared in the press about her and this case, but an extremely critical book called *Palace Coup* has also been published. She argues further that, as her trial progresses, she will confront increasingly intense media coverage that will deprive her of her constitutional right to a fair trial.

The courts have left no doubt that media interest—even where particularly intense—

cannot, by itself, satisfy the heavy burden that confronts any defendant who seeks a change of venue. As the Supreme Court has held,

It is not necessary ... that the jurors be totally ignorant of the facts and issues involved [in a criminal trial.] In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed *some* impression or opinion as to the merits of the case ... To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.

*Irvin v. Dowd,* 366 U.S. 717, 722–723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1960). The Second Circuit has similarly explained that "[j]urors need not be totally ignorant of a defendant in order to be fair and unbiased." *United States v. Moon,* 718 F.2d 1210, 1218 (2d Cir.1983). Indeed, that court has held that "[e]ven where a prospective juror has formed some preconceived opinion as to the guilt of the accused in the case on trial the juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based on the evidence in the case." *Id.* at 1219.

In a characteristically intelligent manner, the late Judge Weinfeld captured the issue presently before this Court.

Publicity, in and of itself, does not foreclose a fair trial. The courts do not function in a vacuum and jurors are not required to be totally ignorant of what goes on about them ... [F]requently in this large metropolitan district prospective jurors show little recall of past widely publicized matters; fears that jurors have formed opinions often prove groundless; the impact of news items upon the public mind, depending upon their nature, may be more imaginary than real ... The fundamental question remains ... [C]an a fair and impartial

jury be obtained which will decide the issues in the case solely upon the evidence presented in the courtroom?

*United States v. Kahaner*, 204 F.Supp. 921, 924 (S.D.N.Y.1962).

■ After reading more than one hundred comprehensive juror questionnaires, and after spending more than three days carefully interviewing more than one hundred jurors individually, this Court has no hesitation in answering that "fundamental question": a fair and impartial jury *can* indeed be obtained in this case, a jury which will—this Court has no doubt—decide the issues before it solely upon the evidence presented in the courtroom.[8]

During the extensive voir dire conducted in this case, the Court excused for cause certain jurors who showed an avid interest in this case or in these defendants, and also excused certain jurors who only *appeared* to have formed an opinion about the matters about to be tried. The defendant's fears to the contrary notwithstanding, not one of the 108 potential jurors mentioned the recently published book *Palace Coup* as a source of information about the Helmsleys. Most of the jurors who stated that they had read or heard news reports about this case could recall the substance of those reports in only the most general terms, if at all. Nonetheless, in those cases the Court carefully asked each juror extensive follow-up questions to ensure that juror's impartiality. Where the Court had any doubt, the juror was excused. Each of the potential jurors also understands—and has sworn to follow—this Court's instruction *not* to read, or watch, or listen to anything about this case.

The Court must also address the press clippings and television news transcripts filed in support of the defendant's motion. Her attorneys assure the Court that the five inch stack of submitted materials "is by no means complete." D.Mem. at 1, n. 1. The materials that *have* been submitted fall far short of establishing "so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial." Fed.R.Crim.P. 21(a). In fact, certain of the submissions undermine the defendant's position, and suggest that her counsel have confused surplusage with substance. The Court now reviews just a few examples.

First, the defendant has submitted duplicate copies of several articles that appeared in the New York press. Second, she has included many articles that appeared in national magazines and newspapers—like *Fortune* and *USA Today*—without even attempting to argue that such publications are read only in Manhattan, and not Philadelphia. Third, the defendant has included articles and cartoons from a wide variety of local newspapers around the country, including *The Houston Chronicle, The Los Angeles Herald Examiner, The Seattle Post Intelligencer, The Miami Herald,* and *The San Francisco Examiner.* The defendant, however, has not even suggested that these newspapers are read—let alone *widely* read—in this jurisdiction. Perhaps most inexplicably, the defendant has included an

---

8. The Court invited counsel to submit proposed juror questionnaires. With only a few exceptions, the questionnaires actually used reflected the concerns articulated by all defense counsel. In addition to familiar questions, the prospective jurors were asked, for instance, detailed questions about: their exposure to this case through the media; their exposure to the Helmsley Hotels advertisement campaign that prominently features Mrs. Helmsley; whether they had ever stayed in a Helmsley Hotel; whether they or a relative had ever worked for a Helmsley owned business, building or hotel; the newspapers and magazines they generally read, and television programs they generally watch; whether they belong to a union; whether they had an opinion as to whether women are treated equally with men in business; whether they believed a person engaged in a large business enterprise is more likely to cheat or break the law; and whether they believed that it is generally accepted in certain industries—such as the hotel or construction industry—to commit crimes as part of doing business.

Each prospective juror was then questioned individually by the Court, with all counsel present. During the voir dire, the Court asked follow-up questions based in part on the prospective juror's answers on the questionnaire. In addition, the Court adopted follow-up questions suggested by all counsel.

Moreover, the Court, exercising its discretion, allowed the defense twenty peremptory challenges and the government twelve.

article from *The Philadelphia Inquirer.* The logic behind the defendant's apparent position—that press coverage in Philadelphia somehow supports her motion to move this case from New York *to* Philadelphia—completely escapes this Court.

Fourth, many articles submitted by counsel mention the defendant only in the most passing and cursory manner. For instance, one article that appeared in *The New York Times*—entitled "Limos: Now It's Easier to Go in Style"—contains this solitary reference to the defendant now before this Court: "Other programs also promote limousine use. [T]he New York *Helmsley* Hotel is planning a week-end package this fall that will include use of a limousine." (emphasis added). Defendant's counsel fails to argue that such stories have had any prejudicial impact on the jury in this case.

Fifth, a great number of the submitted articles contain what the Circuit Court of Appeals in Washington, D.C., has described, in the context of the Watergate prosecutions, as "straightforward, unemotional factual accounts of events and of the progress of official and unofficial investigations." *United States v. Haldeman,* 559 F.2d 31, 61 (D.C.Cir.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). For instance, dozens of articles submitted by defendant merely report in a straightforward manner that one or another appeal taken by the defendant was denied.

Finally, and perhaps most surprisingly, a few of the articles submitted fail to mention any defendant before this Court *at all.* One article from *The Los Angeles Herald Examiner,* for instance, describes the marital problems of the boxing champion Mike Tyson and the actress Robin Givens. At the risk of overstating the obvious, neither one of those individuals is a defendant in this case.

What this review suggests is that any party who submits voluminous papers in support of a motion runs the very real risk that this Court will *read* them.

■ For all these reasons, the defendant's motion for a change of venue is denied.[9]

### D. *Defendant Frank Turco's Motion to Dismiss the Indictment:*

Defendant Turco moves either to disqualify the prosecution team or to dismiss the indictment on the basis of alleged prosecutorial misconduct. This motion traces its origins to a letter to the Court dated April 13, 1989, from the lead prosecutor. In that letter, the government brought to the Court's attention "certain circumstances which might give rise to at least the appearance of a conflict of interest"—namely, that defendant Leona Helmsley, or entities she helps control, may be paying the attorney fees of her co-defendants Turco and Licari.

On May 17, 1989, after the Court conducted a hearing on the possible conflicts of interest implicated by the potential fee arrangement, Turco decided to explore the possibility of cooperating with the government.[10] The prosecutor told Turco that the government would not enter into any cooperation agreement until after Turco had been fully debriefed. Turco understood the following ground rules prior to the debriefing: the government would not use any of his statements from the debriefing

9. In the event her motion was denied, Mrs. Helmsley asked the Court to give specific instructions to the jury—namely that they cannot bring copies of any newspaper to court; that they should not discuss this case with anyone; that they should avoid all media contact about this case, particularly if a member of their household regularly watches television news programs; and that, if any juror has any outside contact about this case, he or she should inform the Court. The Court agrees with the defendant's suggestions, and will so instruct the jury on each trial day. In addition, the Court will instruct the jurors to notify the Court if they come into contact with any media coverage whatsoever about this case. The Court will explain that it is for the Court, and not the individual juror, to determine if even accidental contact with press coverage renders a juror unable to fulfill his oath.

10. The Court appointed Paul Curran, a member of the Manhattan law firm of Kaye, Scholer, Fierman, Hays & Handler as independent counsel to advise Turco of his right to counsel free from conflict.

in its direct case, but the government *could* use any leads, or so-called fruits of the interview, to obtain other evidence against him. Defendant's counsel had asked the government to agree not to use such leads. The government, however, refused. On May 29, 1989, Turco, accompanied by his counsel, William Brodsky, was then debriefed by members of the prosecution team.

The government soon thereafter decided not to use Turco as a cooperating witness and instead offered a plea agreement that Turco rejected.

Turco now charges the government with an elaborate and calculated plan, based on a purported conflict of his counsel, to undermine his relationship with his counsel. He further charges the government with bad faith "by alluding to the possibility of a cooperation agreement that it never intended to pursue," solely to gain a tactical advantage by developing leads from the May 29 debriefing.

The Court concludes that the present motion lacks merit. First, the defendant has ignored the decisions by the Second Circuit in *United States v. Bernstein*, 533 F.2d 775 (2d Cir.1976), and *United States v. Curcio*, 680 F.2d 881 (2d Cir.1982), which establish that a potential and serious conflict does arise merely from the attorney fee arrangement assumed to have been adopted by the defendants in this case.[11] As the cases make clear, once the Court learns of a fee arrangement like the one assumed to be present here, "the necessities of sound judicial administration require the court to take command of the situation." *Bernstein*, 533 F.2d at 788. Defense counsel's assertion, therefore, that "the government first obtained [Turco's waiver] of conflict-free counsel and to the past [conflicts] by insisting that such a waiver was necessary to eliminate 'conflicts' that never existed," Turco Mem. at 11, is off the mark. Such a potential "conflict" certainly did exist, regardless of what

the government may or may not have added by letter.

Second, and equally important, Turco freely admits that his counsel was present during his plea negotiations with the government. *See* Brodsky Aff. ¶ 9. He also admits that he asked the government to stipulate to certain limitations prior to his debriefing, but that the prosecutor refused. Nonetheless, Turco and his counsel went ahead with the debriefing. Significantly, the cases relied upon by defendant address government agents sent to meet with a defendant without that defendant's lawyer being present.

Finally, the Court finds no basis for the defendant's allegation of bad faith on the part of the government. Indeed, the Court agreed with the government that it was necessary for the defendant to waive any past, as well as any future, conflicts, which the defendant freely did.

Accordingly, the defendant's motion is denied in its entirety.

### III. CONCLUSION

For the reasons set forth above, the Court grants defendant Harry Helmsley's motion for a continuance *sine die*, denies defendant Leona Helmsley's motions for a severance and a change of venue, and denies defendant Turco's motion to dismiss the indictment or disqualify the prosecution team.

SO ORDERED.

11. To preclude the possibility of a potentially damaging concession—in light of the conspiracy charged—that Leona Helmsley or Helmsley entities were paying Turco's legal fees, the Court simply *assumed* this to be the case without so finding.